TLC DEVELOPMENT, INC. *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF BRANFORD ET AL.
(13874)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued February 28—decision released July 3, 1990

*Norbert W. Church, Jr.*, with whom, on the brief, was *Marion Malafronte,* for the appellant (named defendant).

*John W. Barnett,* for the appellee (plaintiff).

COVELLO, J. This appeal involves the criteria to be considered by the Branford planning and zoning commission in determining an application for site plan approval. We agree with the trial court's conclusion that, in light of the terms of the applicable zoning regulations, the impact on offsite traffic was not an appropriate reason for denying such an application.

The relevant facts are undisputed. The plaintiff TLC Development, Inc., holds an option to purchase 14.8 acres of undeveloped land abutting United States Route 1 in Branford. On August 1, 1988, the plaintiff applied to the defendant planning and zoning commission of the town of Branford (commission) for approval of a site plan incident to its proposal to build a 152,000 square foot shopping center on the optioned premises. The tract lies entirely within the "Local Business BL District" zone. The plaintiff's proposed development is a permitted use in such a zone but is subject to the submission and approval of a site plan to aid the commission in determining the conformity of the proposed building and use with the specific provisions of the zoning regulations.

On September 15, 1988, the commission conducted a public hearing concerning the plaintiff's site plan application. On October 6, 1988, the commission denied the plaintiff's application. The commission cited as its reasons for denial the increased traffic on Route 1,

increased traffic on local streets in the vicinity, and the "inconveniently" located rear parking area.[1]

The plaintiff appealed the commission's decision to the Superior Court. On June 28, 1989, the trial court, *Clark, J.*, sustained the plaintiff's appeal and ordered the site plan approved. The trial court concluded, inter alia, that the commission lacked the authority to consider offsite traffic impact when determining whether to approve or deny the plaintiff's site plan application. The commission appealed to the Appellate Court. We thereafter transferred the matter to ourselves pursuant to Practice Book § 4023. We conclude that the language of the Branford zoning regulations does not permit offsite traffic considerations to serve as the basis for denying a site plan application and therefore affirm the judgment of the trial court.

The use of site plans in zoning matters is authorized by General Statutes § 8-3 (g). It provides in part: "The zoning regulations may require that a site plan be filed with the commmission . . . to aid in determining the conformity of a proposed building, use or structure with specific provisions of such regulations. . . . A site plan

---

[1] The reasons cited by the commission in denying the plaintiff's application were the following:

"1. Commissioner's concerns regarding the failure to address all aspects of Sections: 31.5.1 'Public Safety' — 31.5.2 'Traffic & Pedestrian Access' — 31.5.3 'Circulation and Parking' — 31.5.7 'Character and Appearance.'

"A. The Commission stated that 'D' is not an acceptable level of service ('LOS').

"B. A decline in level of service to unacceptable levels would occur at the main entrance to Site, at the intersection of East Main and North Main, and on the Northbound and Southbound legs of Chestnut Street at North Main.

"C. Traffic on East Main Street in front of the Site would approximately double.

"D. The increase in traffic on Route 1 between East Main Street and Exit 55 was not adequately addressed.

"E. Rear parking area not conveniently located."

may be modified or denied only if it fails to comply with requirements already set forth in the zoning . . . regulations."

Branford's zoning regulations are set out in five chapters. Chapter III is entitled "Site Plans and Special Uses." Section 31.2 of Chapter III states: "The purpose of this process is to review development plans to insure that they meet the stated purpose of the District [zone] as well as the general and specific standards of these regulations." Chapter III contains § 31.5, entitled "Site Plan Standards." It provides: "In reviewing the Site Plan, the Commission shall take into consideration the public health, safety and general welfare[2] and, as a condition of approval, may require such modifications of the proposed plans as it deems necessary to comply with the specific standards contained herein as well as to assure the accomplishment of the following general objectives. . . ." Thereafter the regulations set forth the general objectives: § 31.5.1, entitled "Public Safety," § 31.5.2, entitled "Traffic and Pedestrian Access," § 31.5.3, entitled "Circulation and Parking, " and § 31.5.7, entitled "Character and Appearance."[3]

[2] In *Goldberg* v. *Zoning Commission*, 173 Conn. 23, 376 A.2d 385 (1977), we sustained the zoning commission's denial of a site plan application even though the proposed shopping mall there in issue was a permitted use in the zone in question. We there stated that, in assessing the propriety of the site plan application, the "total project must satisfy standards set forth in the zoning regulations themselves *as well as conditions necessary to protect health, safety, convenience and property values. General Statutes § 8-2.*" (Emphasis added.) Id., 28–29. Thereafter, the General Assembly amended General Statutes § 8-3 (g) through its enactment of Public Acts 1978, No. 78-104, effective October 1, 1978, to specify that site plans could be modified or denied only if they failed to comply with requirements already set forth in the zoning regulations. By thus narrowing the scope of the commission's inquiry by eliminating considerations that were not specifically articulated in the zoning regulations, we conclude that Public Act 78-104 effectively overruled our earlier holding in *Goldberg*.

[3] The commission's reasons referred to § 31.41, entitled "Public Safety." We are unable to find such a section and conclude that the correct refer-

These are the provisions that served as the authority for the commission's rejection of the plaintiff's site plan application. See footnote 1, supra.

ence was to § 31.5.1. Section 31.5.1 states: "Public Safety: That all buildings, structures, uses, equipment or material are directly accessible for fire, police and ambulance services. Plans shall comply with the Town's Fire Ordinance and the State Building Code."

Section 31.5.2 provides: "Traffic and Pedestrian Access: That all proposed vehicular and pedestrian accessways are safely designed, adequately provided and conveniently arranged to prevent traffic and pedestrian hazards both within the site and on the street. All circulation and parking plans shall be evaluated to determine conformity to these objectives:

"(a) The number, location and dimensions of vehicular and pedestrian entrances, exits, drives and walkways.

"(b) The width, grade and alignment of entrances and exits.

"(c) The distance of entrances and exits from street corners, places of public assembly and other accessways.

"(d) The visibility in both directions at all exit points of the site and the visibility of a vehicle entering or exiting the site to the driver of a vehicle traveling on the street.

"(e) Adequacy of emergency access."

Section 31.5.3 provides: "Circulation and Parking: That the vehicular circulation pattern and the off-street parking and loading spaces are safely designed, adequately provided and conveniently arranged to meet the needs of the proposed uses and to prevent traffic congestion, within the site and on the street. At least the following aspects of the site plan shall be evaluated to determine conformity to this objective:

"(a) The effect of the proposed development on traffic conditions on abutting streets.

"(b) The patterns of vehicular and pedestrian circulation both within the boundaries of the development and in relation to the adjoining street and sidewalk systems.

"(c) The adequacy of traffic signalization, traffic channelization, left turn lanes, or roadway width on the adjoining streets.

"(d) The interconnection of parking areas via access drives within and between adjacent lots or uses, in order to maximize efficiency, minimize curb cuts and encourage safe and convenient circulation.

"(e) The adequacy of vehicular stacking lanes and/or distances.

"(f) The adequacy of pedestrian drop-off areas for visitors, car pools or transit buses.

"(g) The location, arrangement and adequacy of off-street parking and loading facilities.

"(h) The location, arrangement and adequacy of handicapped facilities such as ramps, depressed curbs and reserved 15 foot wide parking spaces.

Although the text of § 31.5 makes it clear that the general objectives are to serve solely as the basis for requiring a modification of the proposed site plan, the commission used these general objectives as the basis for denying the application altogether. To the extent that the content of these general objectives deals with offsite traffic considerations, our review discloses no similar provisions elsewhere in the Branford zoning regulations. Thus, offsite traffic considerations should not have served as the basis for denying the plaintiff's site plan application. Inasmuch as the first four reasons given by the commission all dealt with offsite traffic considerations, we conclude that they could not, by reason of the language contained in § 31.5 of the zoning regulations, constitute a permissible basis for the commission's denial of the site plan application.

Furthermore, with respect to the reasons based on offsite traffic considerations, the commission's decision was inconsistent with the fact that the plaintiff's application was for site plan approval of a use that concededly was already fully permitted under the Branford zoning regulations. This being the case, the result here comports with our earlier stated proposition: "The

"(i) The location and design of vehicle maneuvering areas, backaround areas and fire lanes.

"(j) The physical identification of entrances, exits, one-way drives, small car spaces, handicapped spaces and fire lanes.

"(k) The provision of bumper guards, guard rails, wheel stops, speed bumps, traffic signs, islands, crosswalks and similar safety devices necessary to protect life and property."

Section 31.5.7 provides: "Character and Appearance: That the location, size and design of any proposed building structure or use, as well as the nature and intensity of operations involved in or conducted in connection therewith, their location on the site in relation to streets, parking and adjacent residences and their relationship to the natural terrain, watercourses, waterbodies, wetlands and vegetation, will be compatible and harmonious with the character and appearance of the surrounding neighborhood, and will not be hazardous or otherwise detrimental to the appropriate and orderly development or use of any adjacent land, buildings or structure."

designation of a particular use of property as a permitted use establishes a conclusive presumption that such use does not adversely affect the district and precludes further inquiry into its effect on traffic, municipal services, property values, or the general harmony of the district." *Beit Havurah* v. *Zoning Board of Appeals,* 177 Conn. 440, 443, 418 A.2d 82 (1979).

As its last reason for denying the plaintiff's site plan application, the commission stated "Rear parking area not conveniently located." As authority for this very general statement, the commission again referred to §§ 31.5.1, 31.5.2, 31.5.3 and 31.5.7. These sections set out the "general objectives" referred to in § 31.5. Specifically, § 31.5.3 provides "[t]hat the vehicular circulation pattern and the off-street parking and loading spaces are safely designed, adequately provided and *conveniently arranged* to meet the needs of the proposed uses and to prevent traffic congestion, within the site and on the street." (Emphasis added.) As a "general objective," such a consideration could not serve as the basis for denying the plaintiff's application but could only have served as a reason for requiring a modification.

The commission finally argues that the trial court erred in denying its motion to open the judgment and reconsider the matters before it. We do not agree. Once a judgment has been rendered it is to be considered final and it "should be left undisturbed by post-trial motions except for a good and compelling reason." *Steve Viglione Sheet Metal Co.* v. *Sakonchick,* 190 Conn. 707, 713, 462 A.2d 1037 (1983). We are unable to detect such compelling " ' "cause for which the court acting reasonably would feel bound in duty to [open and reconsider the judgment]." . . . ' " Id., 711. A motion to open and vacate a judgment is addressed to the discretion of the trial court, and we will not disturb the action of the trial court on appeal unless it acted unrea-

sonably and in clear abuse of its discretion. *Gillis* v. *Gillis*, 214 Conn. 336, 340–41, 572 A.2d 323 (1990); *Jaconski* v. *AMF, Inc.*, 208 Conn. 230, 237–38, 543 A.2d 728 (1988).

The judgment is affirmed.

In this opinion, PETERS, C. J., CALLAHAN and GLASS, Js., concurred.

SHEA, J., dissenting. In affirming the judgment of the trial court, the majority advances three grounds: (1) the Branford site plan regulations provide in § 31.5 only for "such modifications of the proposed plans as [the commission] deems necessary to comply with the specific standards contained [in those regulations]," and, therefore, do not authorize the denial of an application to approve a site plan "altogether"; (2) "the language of the Branford zoning regulations does not permit offsite traffic considerations to serve as the basis for denying a site plan application"; and (3) in reviewing a site plan, a zoning commission may not consider the effect that a proposed shopping center will have upon offsite traffic as a basis for disapproving the plan. I disagree.

I

The view of the majority that, in reviewing an application for site plan approval, the Branford zoning commission, having determined that the plan does not comply with the site plan regulations, may only require modifications in the plan but may not disapprove the plan altogether is contrary to our previous holdings that an administrative agency is not "bound to make suggestions to [applicants] as to how their plans should be changed, or to grant the permit upon condition that they be changed." *Piccolo* v. *West Haven,* 120 Conn. 449, 454, 181 A. 615 (1935). "It requires no citation

of authority to say that regulation may in many instances result in prohibition. . . . The plaintiffs asked for the designation of a specific channel as described in their application. . . . The commission was not under a duty to make suggested changes or to grant a rehearing for that purpose." *Shorehaven Golf Club, Inc.* v. *Water Resources Commission,* 146 Conn. 619, 625, 153 A.2d 444 (1959).

Even if the language of § 31.5 can be construed to preclude the absolute denial of site plan approval for failure to comply with the regulations, it would certainly require the applicants to modify the site plan in order to comply with those regulations that were properly found to have been violated upon its first presentation to the commission. At most, the phraseology of § 31.5 would entitle the applicant to a rehearing upon a revised plan. The majority's affirmance of the judgment directing that the plaintiff's site plan be approved unquestionably would be a complete frustration of the legitimate purpose of § 31.5 if the commission's conclusion that the regulations have been violated is sound.

## II

The conclusion of the majority that "the language of the Branford zoning regulations does not permit off-site traffic considerations to serve as the basis for denying a site plan application" wholly ignores the following provisions of the site plan regulations, which are part of the zoning regulations:

"[Section] 31.5.2 Traffic and Pedestrian Access: That all proposed vehicular and pedestrian accessways are safely designed, adequately provided and conveniently arranged to prevent traffic and pedestrian hazards both within the site and on the street.

\* \* \*

"[Section] 31.5.3 Circulation and Parking: That the vehicular circulation pattern and the off-street park-

ing and loading spaces are safely designed, adequately provided and conveniently arranged to meet the needs . of the proposed uses and to prevent traffic congestion, within the site and on the street. At least the following aspects of the site plan shall be evaluated to determine conformity to this objective:

"(a) The effect of the proposed development on traffic conditions on abutting streets. . . .

"(c) The adequacy of traffic signalization, traffic channelization, left turn lanes, or roadway width on the adjoining streets. . . ."

These regulations, as well as § 31.4.7, requiring a "traffic analysis" to be submitted with an application, certainly indicate that "offsite traffic considerations" are a significant factor in approval of a site plan. If the provisions made in the plan of the plaintiff for "traffic and pedestrian access" and for "circulation and parking" were not adequate in the light of offsite traffic conditions to ensure the safety of the public, the commission under these regulations would have been authorized to reject the plan.

## III

The majority also apparently takes the position that, regardless of the language of the regulations, the enabling act for site plan regulations, General Statutes § 8-3 (g), by virtue of an amendment adopted in 1978, does not authorize zoning regulations that make offsite traffic conditions a basis for refusing to approve a site plan. This enactment, Public Acts 1978, No. 78-104, § 4, made several changes in the statute, including the insertion of the following sentence: "A site plan may be modified or denied only if it fails to comply with requirements already set forth in the regulations."

The majority accepts the contention of the plaintiffs that this amendment was intended by the legislature

to overrule *Goldberg* v. *Zoning Commission,* 173 Conn. 23, 30, 376 A.2d 385 (1977), in which this court approved the "concern of the commission as to the impact of traffic upon the area and the overburdening" of a town road as a basis for refusing to approve a site plan for a shopping center. There is, however, no legislative history to support this view, as the plaintiffs concede, nor does the language of the amendment address the question of whether offsite traffic concerns may properly be included in site plan regulations as part of the zoning regulations. In both *Goldberg* and this case, the regulations concerning offsite traffic considerations were "requirements already set forth in the regulations," as the amendment provides. The *only* basis advanced by the plaintiffs for claiming that the amendment signifies legislative disapproval of *Goldberg* is that it was enacted about one year after that decision. It is probable, however, as the majority suggests in footnote 2, that the amendment was intended to overrule the *Goldberg* dictum allowing a zoning commission in reviewing a site plan to go outside the zoning regulations to consider "conditions necessary to protect health, safety, convenience and property values"; id., 28–29; by precluding reliance upon criteria not set forth in the regulations. The failure of the amendment to prohibit consideration of the impact of a proposed structure on offsite traffic, when the regulations so provide, nevertheless, is some indication of legislative approval of such regulations.

The problem with the majority's view that a site plan for a permitted use may not be disapproved on the basis of the impact of that use on offsite traffic, even if the regulations so provide, is that it assumes such a consideration was fully explored at the time the zone permitting such a use was created. That assumption is faulty for two reasons: (1) conditions often change between the time a zone was created and the presen-

tation of a site plan for a specific use; and (2) when a permitted use is open-ended, as in this case where the zone in which the proposed shopping center is situated requires that it contain a minimum of 100,000 square feet but prescribes no maximum, the effect on offsite traffic cannot be adequately visualized until the scope of the permitted use is known. This problem can be resolved, of course, by the adoption of special provisions for such uses as shopping centers, which commonly allow consideration of the effect of a specific proposal upon offsite traffic. I am not aware of anything in § 8-3 (g), however, that bars a town from similarly fine-tuning its zoning determinations through its site plan regulations in the light of specific proposals.

Accordingly, I dissent.