[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, AvalonBay Communities, Inc. (Avalon),[1]
brings this appeal under the affordable housing appeals act. General Statutes 8-30g. Avalon, a developer of residential housing communities, contracted to purchase a 9.58 acre parcel of undeveloped land located at the corner of Prindle Hill Road and Edison Road in the Town of Orange, Connecticut. Avalon's application provided that 25% percent of the rental units would be reserved for individuals who qualify as affordable housing tenants. The defendant, the Town of Orange Planning and Zoning Commission (commission), denied Avalon's application for the special permits needed in order for the project to proceed.
The property, an undeveloped parcel, roughly rectangular in shape, is located in an area zoned as a Light Industrial District #2 (LI-2). At the time Avalon submitted its application, the LI-2 zone permitted a variety of uses, including a Planned Residential Development (PRD). With certain conditions and criteria, the town's zoning regulations expressly allow, by special permit, housing complexes such as the one Avalon contemplated. During the pendency of the application, the commission amended its regulations to delete the PRD provisions in the LI-2 zone.
The original application filed by Avalon contains three parts. It sought (1) site plan review and the issuance of a special permit for a 172 unit apartment complex with 25% of the units set aside as affordable for a minimum of 30 years; (2) special use permit for excavation and filling of earth materials; and (3) an amendment to the town's PRD regulations to reduce caps on affordable housing units and caps on PRD units in the LI-2 and LI-1 districts.
After the commission found that Avalon's application did not result in the caps being exceeded, Avalon decided not pursue its efforts to amend the regulations. The commission held public hearings on the remaining portions of Avalon's application. After which, the commission voted to deny the application. Avalon submitted a modified application pursuant to the provisions of General Statutes section 8-30g(d) within the 10 day period provided for by statute. Among other changes, the modified CT Page 12094 application reduced the number of proposed units from 172 to 168 units. The commission, after a hearing, voted to deny that modified application as well.
This appeal ensued and concerns the commission's decision to deny Avalon's modified application.[2] The court conducted a hearing on this matter on May 17, 1999. Upon a motion by Avalon, and with the consent of all parties, the court viewed the site. In the presence of the parties' counsel and selected party representatives, the court viewed the site twice, at 8:30 a.m. and 4:30 p. m. on May 21, 1999. This inspection entailed walking along Prindle Hill Road for the length of the boundary of the property and standing along the property on Edison Road and observing its location there. Also, the view entailed walking into the property to near the edge of the intermittent waterway.
 JURISDICTION Aggrievement
Avalon alleges that it is "aggrieved as a matter of law within the meaning of §§ 8-8 and 8-30g of the General Statutes, in that the plaintiff is the contract purchaser of the subject parcel for which an affordable housing application has been denied."
For a party to be aggrieved under § 8-8, it "must be affected directly or in relation to a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest such as is the concern of all members of the community, and the appellant must be specifically and injuriously affected as to property or other legal rights." Smith v. Planning Zoning Board, 203 Conn. 317,321, 524 A.2d 1128 (1987). A contract purchaser of the property that is the subject of the application meets this two-part test and has standing to appeal a decision on the application. SeeShapero v. Zoning Board, 192 Conn. 367, 376-77, 472 A.2d 345
(1984); R R Pool Home, Inc. v. Zoning Board of Appeals,43 Conn. App. 563, 569-70, 684 A.2d 1207 (1996).
Avalon has pleaded and proved aggrievement by demonstrating that it is the contract purchaser of the property that is the subject of the affordable housing application. Accordingly, the court finds that during all times pertinent to these proceedings, that Avalon has a valid option to purchase the property from the owner, Ernest Cuzzecreo and Cuzz-Acres Orange Limited Partnership CT Page 12095 and is, therefore, aggrieved.
The commission argues that Avalon lacks standing to appeal the commission's decision because on March 17, 1998 the commission amended its regulations to exclude residential uses and affordable housing projects from light industrial (LI-1 and LI-2) zones. The commission reasons that § 8-30g(c)(2)(A) now allows a commission to deny an application that would place affordable housing in an industrial zone, therefore Avalon cannot be aggrieved by a decision to deny an application that seeks to place affordable housing in a light industrial zone.
The commission's argument improperly relies on the imposition of Orange's zoning regulations as amended on March 17, 1998. The operative regulations are those that were in effect at the time Avalon filed its initial application in 1997. The commission's subsequent amendments do not apply to this appeal. General Statutes § 8-2h.
 Timeliness and Service of Process
The commission published notice of its decision on Avalon's original application on April 9, 1998; the commission then published notice of its decision on Avalon's modified application on June 9, 1998. On June 24, 1998, within fifteen days of the publication of notice, as required by General Statutes §§ 8-8
and 8-30g, Avalon commenced this appeal by service of process on the town clerk and the chair of the commission.
Accordingly, the court has jurisdiction to hear and decide this appeal.
 STANDARD AND SCOPE OF REVIEW
"[W]hen a zoning commission reviews a site plan, it is engaged in a ministerial process. . . ." Connecticut HealthFacilities, Inc. v. Zoning Board of Appeals, 29 Conn. App. 1, 6,613 A.2d 1358 (1992). The commission also acts in such an administrative capacity when it decides an application for a special permit. See Double I Limited Partnership v. Plan ZoningCommission, 218 Conn. 65, 72, 588 A.2d 624 (1991).
"[W]hen acting in an administrative capacity, a zoning commission's more limited function is to determine whether the applicant's proposed use is one which satisfies the standards set forth in the regulations and the statutes." (Internal quotation CT Page 12096 marks omitted.) West Hartford Interfaith Coalition, Inc. v. TownCouncil, 228 Conn. 498, 505-06 n. 10, 636 A.2d 1342 (1994). "The action of the commission should be sustained if even one of the stated reasons is sufficient to support it." (Internal quotation marks omitted.) Property Group, Inc. v. Planning ZoningCommission, 226 Conn. 684, 697, 628 A.2d 1277 (1993).
Section 8-30g(c) provides, in pertinent part, that "[u]pon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development. . . ." Section 8-30g(b) provides, in pertinent part, that "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . may appeal such decision pursuant to the procedures of this section." The statute defines an affordable housing application as "any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing." General Statutes § 8-30g(a)(2).
"The burden of proof established in § 8-30g is a specific, narrow standard that a commission must satisfy on appeal. The plain and unambiguous language does not list noncompliance with zoning regulations as a reason to affirm the denial of an affordable housing subdivision application."Wisniowski v. Planning Commission, 37 Conn. App. 303, 313,655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995). "Section 8-30 does not allow a commission to use its traditional zoning regulations to justify a denial of an affordable housing application, but rather forces the commission to satisfy the statutory burden of proof." Id., 317. The § 8-30g test applies "to every type of application filed with a commission in connection with an affordable housing proposal." West HartfordInterfaith Coalition, Inc. v. Town Council, supra, 228 Conn. 509. The commission must comply with the § 8-30g(c)(1)(A) "sufficient evidence" standard by showing that "the record before CT Page 12097 the [commission] support[ed] the decision reached . . . and that the commission did not act arbitrarily . . . illegally . . . or in abuse of discretion." (Citation omitted; internal quotation marks omitted.) Kaufman v. Zoning Commission, 232 Conn. 122, 153,653 A.2d 798 (1995).
Taking the law governing review of subdivision and special permit decisions together with the provisions of § 8-30g, the court applies a three-part test. First, the court must determine whether the commission has grounded each of its stated reasons on a failure to comply with the zoning regulations. See WestHartford Interfaith Coalition, Inc. v. Town Council, supra,228 Conn. 505-06 n. 10. Second, the court must decide whether there was "sufficient evidence in the record to support the reason for [the commission's decision]." Mackowski v. Stratford Planning Zoning Commission, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 334661 (October 22, 1998, Belinkie,J.). Finally, provided there exists sufficient evidence to support the commission's reason, the court "must then scrutinize the reason itself," to determine whether the commission justification for protecting a substantial public interest outweighs the need for affordable housing under the criteria of § 8-30g. Id.
The public interest must be "substantial." "While established rules of statutory construction would approve resort to a dictionary definition of substantial (strong, solid, firm, stout, Webster's New World Dictionary, 2d College Ed. at 1420) judicial gloss for the provision may be obtained in federal case law as well. In adopting a substantial public interest test the legislature can be presumed to be aware of the report of the Connecticut Blue Ribbon Commission on Housing (February 1, 1989) which discussed both state and federal judicial decisions affecting housing. It appears that from the body of law the legislature borrowed the compelling governmental interest test and its burden shifting characteristics and devised its own substantial public interest test. See Kennedy Park HomesAssociation v. City of Lackawana, 436 F.2d 108 (2d Cir. 1971); U.S. v. City of Black Jack, Missouri, 508 F.2d 1179 (8th Cir. 1975); Huntington Branch NAACP v. Town of Huntington, supra. In U.S. v. City of Black Jack, Missouri, the court outlined a three part test for determining whether any of the reasons advanced rose to the level of a compelling governmental interest. That test requires both a qualitative and quantitative analysis. Id. At 1187, n. 6 and 7. The legislative history of § 8-30g seems to support this test. 32 H.R.Proc.Pt 30, 1989 Session, 10,642." CT Page 12098Kaufman v. Danbury Zoning Commission, Superior Court, judicial district of Hartford at Hartford, Docket No. 507229 (August 13, 1993) (Mottolese, J.), aff'd 232 Conn. 122 (1995).
 DISCUSSION
As previously noted, the operative zoning regulations that apply to this appeal predate the commission's March 17, 1998 decision to repeal the PRD regulations as to Orange's light industrial zones. Section 8-2h of the General Statutes provides that "[a]n application filed with a zoning commission, planning and zoning commission, zoning board of appeals or agency exercising zoning authority of a town, city or borough which is in conformance with the applicable zoning regulations as of thetime of filing shall not be required to comply with, nor shall it be disapproved for the reason that it does not comply with, any change in the zoning regulations or the boundaries of zoning districts of such town, city or borough taking effect after the filing of such application (italics added)." Applying § 8-2h, the court shall consider only the regulations in effect on the date Avalon filed its initial application.
The commission stated a variety of reasons for its denial of Avalon's original and modified applications for the special permit and site plan approval. The court must evaluate each reason individually, since any one valid reason is sufficient to justify the commission's action. See Property Group, Inc. v.Planning Zoning Commission, supra, 226 Conn. 697.
 Inland Wetlands Denial
The commission denied Avalon's application, in part, because Avalon had not obtained a permit from the Town of Orange Inland Wetlands and Watercourses Commission (IWWC). The commission reasoned that "[t]he preservation of wetlands and compliance with the Inland Wetlands and Watercourses Act and the regulations of the [IWWC] are matters of substantial public interest which have not been satisfied by the applicant and which outweigh the need for affordable housing. . . ."
In a companion case[3] involving IWWC's decision, the court sustained Avalon's appeal. The court directed that the IWWC approve the application with any reasonable conditions it may deems necessary consistent with the court's ruling and the Inland Wetlands and Watercourses Act. See General Statutes §§ 22a-28
to 22a-45d, inclusive. CT Page 12099
Accordingly, the commission's reliance on the IWWC's denial of Avalon's wetlands application is misplaced. As a result, the commission's first stated reason for denying the application is invalid.
 Violation of Height Requirement
The commission stated as a reason for its denial of the application that Avalon's proposal "violate[d] the requirements of § 30.5.1.1 in that three of the applicant's buildings are four and a half stories in height where three and a half stories [are] required under the regulations which results in a height to ground elevation on one side of each of the three buildings of fifty-two feet. The purpose of the three and a half story regulation is to assure the safety of the residents as the town's fire apparatus has a maximum achievable height of forty feet."[4]
Section 30.5.1.1a of the town's zoning regulations provides that, in a residential district, "[n]o building shall exceed a height of [forty] feet, or [three and a half] stories."[5]
The site plan for the apartment complex disclosed no building to be in excess of 40 feet in height, or, more than 3 1/2 stories tall. The applicant provided expert testimony, through a memorandum from its architects David B. Schiff and Josh A. Moreinis of Saccardi Schiff, Inc., that the height and stories of the proposed building comply with the town's zoning regulations. As shown in the plans, the basement levels do not exceed five feet above ground level and therefore do not qualify under the regulations as a "story." The lofts are considered a "half story" under § 6.13 of the zoning regulations. The site plan displays proposed construction no more than 3 1/2 stories tall. The architects calculated the measurements for each building from the finished ground level to the roof ridges and, in every instance, the height did not exceed 40 feet. When considering that these measurements must be from finished grade, there is nothing in the record to dispute these assertions. Further, from the point of view of fire safety and accessibility to the upper stories, it is only sensible to measure from the finished grade, which is the ground level that the firefighters will place their equipment upon.
With reference to fire safety, in his review of the proposed site plan, Timothy Pelton of Holdsworth Associates (a CT Page 12100 "consulting and training firm specializing in the design and enhancement of emergency response systems"), concluded that the project "[was] sound from a fire safety/response perspective." Pelton based his conclusion on the town's fire equipment and "the delivery of an aerial fire truck with a 110 foot ladder anticipated in the first quarter of 1998." He also noted that "the uppermost floors in both the front and rear of all structures are accessible with 36 foot ground ladders."
Therefore, the record does not reasonably support the commission's claim of noncompliance with the regulation; and, in any case, the height of the buildings poses no fire safety risk and therefore does not constitute a substantial interest in safety that outweighs the need for affordable housing. General Statutes § 8-30g(c)(1)(A)-(C).
Accordingly, this cannot form a valid basis for the commission's decision.
 Excessive Number of Units
The commission denied Avalon's application in part because its plan "violate[d] § 30.12.1b and § 30.4.2 of the regulations in that, excluding the pending application, 218 units have been authorized under § 30, therefore the applicant's proposal of 172 units exceeds the maximum number of authorized units by 150 units." As noted, Avalon's modified application reduced the number of proposed units to 168 units, of which 25% (42 units) would be reserved as affordable housing.
Section 30.12.1b of the town's zoning regulations requires that the commission approve a plan only if "[t]he qualifying PRD standards and the planning and design PRD standards have been met." Section 30.4 provides, in pertinent part, that "[i]n order to allow for the orderly provision of municipal services and so as not to overburden the infrastructure capacity of the Town, and so as not to have an undue concentration of housing units . . . [t]here will be a maximum of 240 housing units authorized in accordance with this section."
At the time Avalon submitted its application, 218 units had already been approved under the town's PRD regulations. The regulations permit a total of 240. Avalon's modified proposal includes 168 units. Adding 168 units to the existing 218 results in a total of 386 units and, clearly, exceeds, by 146 units, the 240 limit adopted in the regulations. (Zoning Regulations § CT Page 12101 30.4.2). The commission had sufficient evidence to conclude that the proposed plan failed to comply with the regulations. General Statutes § 8-30g(c)(1)(A).
That, however, does not end the court's inquiry. This court must also determine whether the commission's decision was "necessary to protect substantial interests in health, safety, or other matters which the commission may legally consider." General Statutes § 8-30g(c)(1)(B).
In support of its denial, the commission stated that "the limitation[s] in the regulations are based upon a detailed study setting forth the actual need for affordable housing within the town of Orange." It further reasoned that "the need to limit the size and scope of residential development within the industrial zone is of tremendous importance for the protection of the health, safety, welfare and property values of the community." These reasons can be best characterized as concerns about intensification of land use or density. The commission, however, failed to articulate grounds from which the court could find a sufficient basis in the record to conclude that the issue of density represents a compelling governmental interest. "In order to qualify as a legitimate basis for denial of this application, density must represent a substantial public interest in `health, safety or other matters which the commission may legally consider'. Section 8-30g(c)(2). Thus, it is not just a public interest which the commission must seek to advance but that public interest must be substantial." Kaufman v. Danbury, supra.
Avalon has documented the need for affordable housing, as defined by statute. See General Statutes § 8-30g(a)(1). Although the commission argues that nearly ten percent of housing in Orange is affordable "from a price standpoint (if not from a deed restriction standpoint)" the only inquiry relevant to this appeal is whether or not Orange has enough housing that meets the statutory definition of affordable housing.[6] It does not.
The 1997 report of the State of Connecticut Department of Economic and Community Development disclosed that only 1.64% of the housing stock in Orange is credited toward the statutory exemption threshold for deed restricted and/or government-assisted living units. General Statutes § 830g(f). Furthermore, although it is a legitimate goal of zoning to consider the most appropriate and desirable use of land; General Statutes §§ 8-2, 8-23; the unique standard of § 8-30g
requires that the commission show a substantial public interest CT Page 12102 in limiting the number of units in the PRD (and on the subject property) that outweighs the need for affordable housing. General Statutes § 8-30g(c)(1)(B)-(C). It cannot be said that the commission performed this balancing analysis as required by statute. The balancing requires a threshold acknowledgment of the need for affordable housing in the Town of Orange, which the commission has steadfastly denied at argument and in its brief.[7]
With respect to the commission's concern about the effect of Avalon's development on the provision of municipal services, our Supreme Court has stated that "[t]he designation of a particular use of property as a permitted use establishes a conclusive presumption that such use does not adversely affect the district and precludes further inquiry into its effect on traffic, municipal services, property values, or the general harmony of the district." TLC Development, Inc. v. Planning ZoningCommission, 215 Conn. 527, 532-33, 577 A.2d 288 (1990); see alsoIndian River Associates v. North Branford Planning ZoningCommission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 392496 (May 11, 1992, Berger, J.) (affordable housing appeal). Therefore, because residential developments were permitted under the PRD regulations at the time of the application, the court cannot uphold the commission's rationale that the proposed development will damage the town infrastructure.
The commission's conclusion that the 150 units (or 146 units under the modified application) in excess of the PRD's limits would adversely impact the town infrastructure is not supported by sufficient evidence in the record. Much of it is conjecture. The data provided of the actual impact of Avalon developments on town services in other communities is conflicting and inconclusive. The concern over the projected use of fire, police and ambulance services by way of service calls was largely financial in nature. "A zoning [decision] whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities cannot be held valid." Rinaldi v.Zoning Planning Commission, 1990 WL 269380 at *11 June 29, 1990) (Corradino, J.)
The record does not support the commission's correlation of the town's PRD regulations and its concerns about safety. In addition, fiscal zoning is an inappropriate goal and it can not outweigh the need for affordable housing. As to this reason, the CT Page 12103 commission has failed to meet its burden under § 8-30g.
 Excessive Floor Area Ratio
The commission stated as a reason for denial that "[t]he proposed development violates § 30.5.1.2c in that the floor area ratio exceeds .40." The commission reasoned that "[t]he floor area ratio is of considerable zoning importance in that it sets the standard which, together with other bulk requirements, establishes maximum density, coverage and number of units which may be developed on any site." The commission concluded that the proposal was too dense and included too much building coverage.
Section 30.5.1.2c provides that "[t]he maximum building floor area to site area ratio (FAR) shall not exceed the following schedule:
i) At least 20% of the units deed restricted as affordable units: FAR .40
ii) 100% of the units deed restricted for residents age 62 or older: FAR .50
John Gilmore of the engineering, landscape architecture and environmental science firm of Milone MacBroom, calculated the FAR for Avalon's site plan. In his letter to Avalon, Gilmore stated that "[t]he total project site is 9.588 acres (417,653 square feet). Therefore, the maximum building floor area allowed is 167,061 square feet (417,653 square feet x .40). The total building floor area you propose is 166,957 square feet [164,516 square feet (172 units) + 2,441 square feet (amenity building)]. This is below the maximum allowable FAR. The proposed building floor area was measured from outside wall to outside wall as stated in section 6.11 of the town's zoning regulations. Note that this section requires only finished livable floor area to be included in the determination of FAR. The regulations exempt garages, unheated enclosed porches and hallways for common use by occupants of two or more dwelling units."
The town's planning consultant, Roger O'Brien, "stated the applicant has incorrectly calculated the density for this project because they did not measure from the outside walls. As one example, he stated his scaling of the plans determined that building #2 exceeds the FAR by approximately 3,272 square feet. . . . O'Brien maintains that this is important because the project density determines the impact on roads, schools, sewers CT Page 12104 and the surrounding properties."
Gilmore's letter to Avalon directly contradicts O'Brien's conclusion that Avalon failed to measure from the outside walls. During argument, this dispute centered on whether breezeways should be included in the computation of floor area. The regulations expressly prohibit the inclusion of floor area measures for "outside vestibules," as well as "hallways and other space designed for common use by occupants of two (2) or more `dwelling units'." (Zoning Regulations § 6.11). Because the regulations provide for the measurement of only "finished livable floor area," enclosed breezeways should not be included in the measures. The record, while conflicting, does contain sufficient evidence, based on the letter of O'Brien, to conclude that Avalon improperly measured the FAR and may exceed the regulations.
First, this measurement applies to the original application only. The modified site plan offered by Avalon computed the FAR as .39 (164,517 square feet). This falls below the .40 (167,061 square feet) floor area ratio permitted by the regulations. Nothing in the record regarding the modified application supports the commission's conclusion that Avalon's proposal exceeds the FAR requirements, or, if they did, to what amount. The commission in its denial of the modified proposal, wrote, "[w]ith the exception of providing parking . . . the proposed modification fails to address or satisfy the reasons and basis for the denial of April 2, 1998." The record does not support the commission's conclusion that Avalon's modified proposal violates the FAR requirements of the town's zoning regulations.
Secondly, even if it could be extrapolated by the commission, based on its own calculations, that Avalon failed to comply with the FAR requirements, the commission has not articulated what, if any, substantial public interest adherence to this regulation protects or that enforcement of the regulation outweighs the need for affordable housing. It is hard to imagine, in any case, that a substantial public interest is invoked by a regulation violation resulting from a measurement to the inside of a wall, rather than the outside of that very same wall.
Accordingly, this cannot provide a valid basis for the commission's actions.
 Traffic, Open Space, and Road Adequacy Concerns
The commission's denial was, in part, based on its conclusion CT Page 12105 that "[t]he proposal violates § 30.12.1c of the Orange zoning regulations in that the traffic resulting from the proposal will reduce the level of service [LOS] at the intersection of Indian River Road and Prindle Hill Road from a current [LOS] C to a [LOS] D." The Town of Orange Comprehensive Plan `grades' the levels of service sought for different parts of the community. A service level of C is better than a service level of D.
Section 30.12.1c of the regulations provides that before the commission may approve a PRD final plan, the commission must first find that "[p]rovisions for traffic, water, sewerage, stormwater and usable open space are adequate, do not overburden existing streets, water, sewer and stormwater drainage facilities on- or off-site and do not create water problems off-site." Edwin Lieberman, the town engineer and director of public works, stated that the traffic report[8] for the Avalon development "proposes a reduction in the level of service ("LOS") at the intersection of Prindle Hill and Indian River Roads, which should not be acceptable to the town. We should be striving for improvements, not reductions to service at our intersections.
"Improvements to this intersection in the form of road widenings and new traffic signals are requested." Following the modification of the Avalon application, O'Brien, the town planner, stated that "[t]he traffic [LOS] degradation is still present."
Bruce Hillson, a traffic engineer whose advice Avalon sought, "did some additional traffic counts during the afternoon peak hour. . . ." He took these counts because "the traffic commission [had] questioned the accuracy of the applicant's traffic volumes as the traffic counts for this project were taken before several new businesses opened in the area. Mr. Hillson found that there was an increase in background traffic at this intersection. During his re-evaluation for existing conditions, Mr. Hillson found that the intersection is operating at an overall [LOS] C. By increasing traffic volumes by [two percent] and adding traffic for developments that have yet to open, it was determined that the overall LOS will be D before adding the traffic from the Avalon development. Mr. Hillson stated minor timing revisions can be made to the traffic signal to accommodate the site generated traffic and to maintain the overall LOS D. Mr. Hillson stated that the overall [LOS] for this intersection will remain the same with or without the proposed development.
"In response to town engineer Edwin Lieberman's memo of CT Page 12106 12/12/97 expressing his concerns about the reduction of the overall [LOS] at this intersection, Mr. Hillson noted the reduction is the result of the growth of background traffic and not as a result of the traffic to be generated by the Avalon project."
O'Brien responded to these new findings when he spoke before the commission on January 14, 1998. He "referred to the 1985 Comprehensive Town Plan which calls for LOS `C' to be an acceptable goal throughout the town. He maintains that LOS `D' is not acceptable."
At the February 2, 1998 meeting of the commission, Robert Bass, a traffic engineer from Milone MacBroom, stated that "[t]he existing afternoon peak hour LOS is expected to drop from C to D based on the growth of the background traffic without the Avalon development. Mr. Bass maintains the LOS will remain at D with the addition of the traffic from the Avalon site." He added that LOS "is determined by the number of vehicles expected to be generated during the peak hour." Avalon's vice president of development noted that "the complex is expected to generate 110 vehicles during the peak hour," and that Avalon "will contribute to any improvements based on the project's impact at the intersection."
At the May 19, 1998 meeting of the commission, O'Brien "noted that [Avalon] did not provide any documentation" to support its claim that the degradation of the LOS would result from an increase in background traffic. Even though the commission was entitled to credit O'Brien's opinion, the commission must still show that its action protected a substantial public interest in health, safety or other legitimate goals of zoning that outweighs the need for affordable housing. General Statutes §8-30g(c)(1)(B)-(C).
Although traffic control is a legitimate goal of zoning; General Statutes §§ 8-2 and 8-23; the commission has failed to demonstrate that a decrease in the LOS presents a substantial public interest that takes priority over the need for affordable housing. Evidence presented at the hearing referenced an LOS goal of C status; the necessity for that status was not explained. There was sufficient evidence in the record to show that a D status, after consideration of traffic generated by other approved projects, created the existing circumstance and would not be lowered by this project. Had that public interest been substantial then the commission would presumably have sought to CT Page 12107 protect its interest in LOS by restricting projects in Orange that generate additional traffic, and, as the record makes clear, it has not done so. Further, the commission had no evidence before it to conclude that a C status was any more attainable absent this project than with its approval. Finally, the commission did not consider what LOS improvements could be made by Avalon as a condition of permit approval. Avalon offered the placement of a traffic light to protect the LOS; but the commission did not consider it before concluding that ". . . the substantial public interest which are the basis of this application cannot be protected by reasonable changes to the proposal."
The commission also based its denial upon its conclusion that "[t]he proposal violates § 30.12.1c of the regulations as the provisions for useable open space within the site are inadequate. [Section] 30.8.7 requires 250 square feet of useable open space per unit in the light industrial zone. In the case of the present proposal 43,000 square feet for the residents of a project of this size, particularly in an industrial zone where there is no place for people to congregate or children to play, is a matter of significant concern to the welfare of the residents. . . ."
Section 30.12.1c provides, in pertinent part, that to approve a PRD plan, the commission must find that the provision for open space does not "overburden existing streets, water, sewer and stormwater drainage facilities on- or off-site and do[es] not create water problems off-site." Section 30.8.7 of the regulations requires that there be 250 square feet of open space per dwelling unit for a PRD in light industrial zone two. (Zoning Regulations, § 30.8.7b.) The regulations further provide that a PRD must include one contiguous area with the smallest dimension being 150 feet for a parcel of five to less than ten acres. (Zoning Regulations, § 30.8.7d.)
The original application complies with § 30.8.7 because, multiplying the number of units (172) by the open space required (250 square feet per unit), 43,000 square feet of open space are required for the proposed development. The plan itself provides for ± 100,000 square feet of open space. The modified application of 168 units required 42,000 square feet of open space and the plan provided for 106,000 square feet of open space. The commission argues that notwithstanding the compliance, the utilization of the swimming pool as a part of the open space and its perceived lack of facilities or open space designated for children is a "significant concern" because of the need for CT Page 12108 recreation space for children and adults. There is not sufficient evidence in the record to support the conclusion that the open space is insufficient for the needs of prospective children and adult residences. The zoning regulations do not exclude swimming pools from the definition of open space. The commission lacks the power to deny a subdivision or site plan application if it complies with the regulations. See West Hartford InterfaithCoalition, Inc. v. Town Council, supra, 228 Conn. 505-06 n. 10.
Based on the same reasoning, Avalon's compliance with the requirement of a contiguous area, the smallest dimension of which measures at least 150 feet, prevents the commission from denying the application on that basis. The site plan submitted by Avalon reveals open space between the two sides of the development. The width of that area is over 150 feet at its narrowest, as is the length, thus satisfying the latter portion of the regulation.
The commission stated as an additional reason for its denial that "[t]he proposal violates § 30.12.1e of the regulations in that the proposal would require an upgrade of the abutting streets and the applicant failed to provide information, plans and data to enable the commission to make an analysis as to the specific needed road improvements."
Section 30.12.1e requires for commission approval a finding that "[t]he PRD will not require upgrading of the street system in the town of Orange. If the [commission] in its discretion, elects to permit the necessary upgrading of the street system, the applicant will pay for any required upgrading."
The commission was entitled to believe the town engineer's conclusion that Avalon did not demonstrate that the projected increased in traffic at the intersection of Indian Hill Road and Prindle Road would result from other developments and not its own. The commission, however, has not sustained its burden of showing that the increased traffic would necessitate an upgrade of the intersection, or that such an upgrade affects a substantial public interest that outweighs the need for affordable housing. General Statutes § 8-30g(c)(1)(A)-(B).
The court notes that the primary interest in upgrading roads is financial and, further, that Avalon offered to contribute to any necessary road improvements (albeit, the regulations do require developers to pay for such improvements).
The commission has failed to demonstrate that an upgrade CT Page 12109 would be necessary, or that, if the upgrade were necessary, that an upgrade affects a substantial public interest in health, safety or other zoning matters sufficient to trump the need for affordable housing. General Statutes § 8-30g(c)(1)(A)-(B).
 Inadequacy of Parking
The commission stated as a reason for its denial that "[t]he proposal fails to provide adequate parking. The application shows in addition to the residential units and recreational building, office use for management and rental offices within the recreational building. Under § 42 of the regulation for required parking for office, the plan as proposed lacks nine required parking spaces on site." The commission further observed that it "[was] unpersuaded by the applicant's argument that it [would] control the required parking by restricting the number of cars to two per dwelling unit. The commission [found] that this would not be readily enforceable in violation of § 30.12.1i of the relations. . . . Failure to provide adequate parking raises significant health and safety concerns as it will result in cars parking in fire lanes. . . .
Section 42 does not discuss parking space requirements for offices other than in the building office park (BOP) district. (See Zoning Regulations, § 42.2.7.) Section 30.12.1i, however, requires for commission approval that "[w]here appropriate, the applicant has provided for continuing maintenance of parking areas, stormwater drainage facilities, open space and other infrastructure or amenities not to be accepted by the town of Orange."
Neither the town engineer nor the chief of police voiced concerns about the adequacy of parking. However, at the commission's January 14, 1998 meeting, the town's planning consultant indicated that he "found the plans difficult to read as the spaces were not numbered. He [was] concerned about the distance between the buildings and the parking areas, especially for building #4. He stated the spaces are not equally distributed throughout the site."
After reviewing the modified proposal, the same planning consultant for the town was satisfied that "361 spaces are being provided and 357 are required." He also indicated that "[p]arking for the rental office has been addressed in the modified plan."
The record reveals that Avalon's modified application CT Page 12110 addresses the concerns raised by the commission. The commission's inadequate parking rationale is itself inadequate and not supported by sufficient evidence on the record. The commission has not demonstrated, through the evidence, that a limitation on the number of cars allowed for each unit would go unenforced, or that cars would park in fire lanes. "The commission's expressions of opinion d[o] not . . . rise to the level of sufficient evidence to sustain its burden of proof. . . ." Rinaldi v.Suffield Zoning Planning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533603 (October 26, 1995, Leheny, J.).
 Inadequate Provision for Snow Clearance and Storage
The commission's decision was based, in part, on its conclusion that the application violates § 30.12.1b and § 30.7.6 of the regulations in that the proposal fails to provide adequate, unobstructed space for snow clearance of parking spaces and adequate storage for cleared snow. The clearing and storage of snow is of significan[t] importance to assure immediate access for police, fire and emergency personnel and equipment. The applicant's statement that snow would be trucked from the site is inadequate and is not readily enforceable and thereby violates § 30.12.1i of the regulations." Section 30.12.1b allows the commission to approve a PRD only if it first finds that "[t]he qualifying PRD standards and the planning and design PRD standards have been met." Section 30.7.6 requires that "[a]dequate, unobstructed space shall be provided for snow clearance of parking spaces," and that "[p]rovision shall be made for adequate storage of cleared snow." The regulations further provide that, for approval, the commission must find, "[w]here appropriate, [that] the applicant has provided for continuing maintenance of parking areas, stormwater drainage facilities, open space and other infrastructure or amenities not to be accepted by the town of Orange." (Zoning Regulations, § 30.12.1i.)
As the commission concedes, Avalon has stated that snow would be trucked from the site. The commission had the authority to condition its approval on the removal of snow from the parking areas to an off-site location. The commission's rationale behind this stated reason of denial is that Avalon and its residents would not enforce the requirement of snow removal. Such an unsubstantiated fear on the part of the commission, however, does not "rise to the level of sufficient evidence to sustain its burden of proof. . . ." Rinaldi v. Suffield Zoning PlanningCT Page 12111Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 533603 (October 26, 1995, Leheny, J.).
 Decrease in Neighboring Property Values
The commission stated, as a reason for its decision, that "[t]he proposal violates § 30.12.1g of the regulations in that it will have a significant adverse effect on surrounding properties and property values in the area. . . . The evidence is clear and compelling that the proposed residential development will have a significant adverse impact on the property values of surrounding industrial properties. . . ."
Section 30.12.1g provides that for the commission to approve a PRD, the commission must find that "[t]he development and design of the PRD will not have a significant adverse effect on surrounding properties or property values in the area."
Orange's economic development commission concluded that Orange "has a limited amount of land to build on for industrial use, and this project is an inappropriate use of the land and location for the project." In addition, a study by Christopher Kerin of Kerin Commercial Real Estate, which evaluated the impact of the Avalon project on an abutting industrial building, concluded that the proposed development "will have a significant negative impact on the abutting newly-constructed manufacturing facility located at 235 Edison Road," and that "[t]he apartment complex will also have a negative impact on the Pez factory at the southeast corner of Prindle Hill Road and Edison Road. . . ." One town resident also testified that he believed that the development would negatively impact surrounding property values.
Avalon presented a real estate appraiser, Arthur Estrada, whose "work entailed the following: 1) a study of the characteristics of the existing neighborhood uses and the proposed development; 2) analyzed the relationship between the existing residential and industrial uses in the area; 3) studied the existing zoning; and 4) studied the impact of the removal of the parcel from the industrial tax base."
"He reviewed two areas in Milford where industrial and residential uses co-exist. Mr. Estrada studied sales of industrial and residential uses and found no supportive data that shows that these properties have suffered. Mr. Estrada stated that he studied the Avalon project in Hamden of 764 units on 38.4 CT Page 12112 acres, which abuts an industrial park. After studying the sales information, Mr. Estrada stated he found no data to indicate that either development has suffered any diminished property values."
Kerin disputed Estrada's report, stating that "the introduction of new manufacturing processes at the Wallach facility [an abutting property owner] will be severely restricted by the EPA standards. Mr. Kern stated Mr. Wallach would be faced with a reduced market demand for his industrial building should he decide to sell due to the proximity of the Avalon project. He believes many industrial users would refuse to locate to a facility that is adjacent to a high density residential development." In addition, Ron Wallach, owner of the abutting Wallach Surgical Devices, "stated he owns a light industrial building on Pepe's Farm Road [in Milford] and he has experienced mail theft and other forms of vandalism to the building and property. He stated he chose to move to Orange to be located in a completely industrial zone. He feels the approval of the Avalon project will cause the same problems he experienced in Milford. He believes his property values will be negatively impacted. He noted that he did not receive any offers near his asking price for the Milford building." The town's planning consultant agreed that "the area is inappropriate for housing."
"Under § 8-30g the significance of protecting property values as a substantial public interest falls to a lower level in the hierarchy of importance. It is the view of this court that the legislature has already determined that an affordable housing development should not, solely by its nature, be considered harmful to property values." Pratt's Corner Partnership v.Southington Planning Zoning Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 508877 (June 21, 1993) (Mottolese, J.). Moreover, "[t]he designation of a particular use as a permitted use establishes a conclusive presumption that such use does not adversely affect the district and precludes further inquiry into its effect on traffic, municipal services, property values or the general harmony of the district." (Internal quotation marks omitted.) TLCDevelopment, Inc. v. Planning Zoning Commission, 215 Conn. 527,532-33, 577 A.2d 288 (1990).
Affordable housing developments are permitted in the PRD, thus giving rise to a "conclusive presumption" that the use does not adversely affect property values. See Id. Furthermore, courts do not consider affordable housing itself injurious of property values. See, e.g., Mackowski v. Stratford Planning ZoningCT Page 12113Commission, supra, Superior Court, Docket No. 334661. Although Kerin's and Wallach's statements support the commission's decision and reveal a public interest in the maintenance of property values, their beliefs that property values will be negatively affected are insufficient to outweigh the legislated interest in providing affordable housing. See General Statutes § 8-30g(c)(2)(C). Further the record reveals that the residential development of this property, in a zone which previously permitted such uses, will not result in a significant depletion of the availability of land zoned for industrial uses.
Accordingly, this cannot provide a basis for the commission's denial of Avalon' s application.
 Density of Development
What is clear from the record, and, perhaps the most troubling aspect of this appeal, is that Avalon's modified development, incorporating 168 units, represents approximately 4% of the housing units in the Town of Orange. This 4% increase, in one localized area, provides the commission with concerns, which all form the basis of its denial, that the town will not have the sustained ability to continue to provide services to all members of its community and, further, this type of development is not in harmony with the town's surroundings. The commission evinces an overriding anxiety that sheer increase caused by Avalon's development will have some adverse effect on these needs. Nevertheless, there is also a legislatively declared substantial public interest in having each and every community in this state provide affordable housing in every community in compliance with the statutory mandate of General Statutes section 8-30g.
The commission based its decision, in part, on its final conclusion that "the proposal violates the provisions of § 32.6 of the regulations and in particular § 32.6.1 with respect to the size and intensity of the proposed use, which is far too dense and overdeveloped given its location surrounded by industrial users, § 32.6.3 due to the reduction of level of services at Prindle Hill and Marsh Hill Road, § 32.6.4 with respect to the effect on property values and the location of the site and its proposed development of buildings and locations in such near proximity to the industrial zone, § 32.6.5 as a result of the lack of adequate parking and § 32.6.6 as a result of the inability to properly service the site with fire and police protection. . . ."
CT Page 12114 Section 32.6 requires the commission to "consider the following before acting on any [s]pecial [u]se [a]pplication:
 "32.6.1 The size and intensity of the proposed use, and the size of the lot on which it is to be located;
* * *
 "32.6.3 The capacity of adjacent and feeder streets to accommodate peak traffic loads, and any traffic hazards that may be created by the use;
 "32.6.4 The effect upon property values and appearance in the neighborhood, taking into account the topography of the lot and the character, location and height of the proposed buildings and structures and the site plan and proposed landscaping;
 "32.6.5 The number, location and arrangement of off-street parking and loading spaces and the vehicular access to the lot;
"32.6.6 Fire and police protection needs."
The reduction in the level of service at the intersection of Prindle Hill and Marsh Hill roads, the effect on property values, the adequacy of parking, and the adequacy of police and fire protection the court has already addressed separately, therefore, the size and density of the development remain the only outstanding concerns.
As to the size and density, the commission argues only that "the open space requirements . . . were not met in spirit in that `open space' should NOT include pool and buffers, and this is the way that the applicant calculated open space." The commission's stated concerns about its perceived lack of open space, however, relate to the lack of adequate "room in which to recreate." Based on that concern, the inclusion of a pool in the calculation of open space is entirely appropriate. Moreover, the regulations do not provide that all open space must also be recreation space or non-buffer space. (See Zoning Regulations § 6.23.) This being the only argument offered on size and density, Avalon has complied with the regulations and, therefore, the commission may not deny the application on the ground that Avalon's modified site development is too large or dense.
CT Page 12115 The Modified Application
The commission denied the modified application because, the commission concluded, the application was "substantially the same plan denied by the commission at its meeting of April 2, 1998." The commission incorporated the reasons it gave for its denial of the original application and added that the elimination of the walkway adjoining the two sides of the development "raises matters of significant concern to the safety of residents and the protection of wetlands."[9] Further, the commission premises its denial upon Avalon's failure to apply to the IWWC "simultaneous or prior to the filing of an application with the Planning Zoning Commission."
The issue of the elimination of the walkway and its effect, if any, on the wetlands is within the jurisdiction of the IWWC, not the zoning commission. Furthermore, the court is satisfied, after having visited the site of the proposed development, that walking beside the road does not, based on its inspection and site walks, present a substantial risk to the safety of the development's residents.
The applicant was not required to file a new zoning application when it filed a new wetlands application. The relevant information was before the commission. The mandates of General Statutes section 8-3c cannot be read to require this, when the real goal is coordination of the two application processes, which occurred here. Arway v. Bloom, 28 Conn. App. 475
(generally) (1992), aff'd, 227 Conn. 799 (1993).
At the conclusion of the denial of the original proposal, the commission stated, "The Commission finds that the substantial public interests which are the basis of the denial of this application, cannot be protected by reasonable changes to the proposal." The record discloses no attempt to discuss reasonable changes with the applicant to satisfy the commission's concerns, before or after the commission denied the original proposal nor after the commission denied the the modified proposal.
"[W]e conclude that where the zoning commission establishes that there is sufficient evidence in the record to support its determination that there is a substantial public interest that would be harmed by the proposed affordable housing development, and where that interest and harm are site specific, in the sense that no changes to the proposed development reasonably can be determined to protect that interest on that specific site, the CT Page 12116 zoning commission has satisfied its burden." Christian ActivitiesCouncil, Congregational v. Town Council, 249 Conn. 566, 579, ___ A.2d ___ (1999).
The only site specific reasons for denial went to the presence of this proposed development in an industrially zoned area. However, those reasons cannot be sustained because this use (PRD) of the property was explicitly authorized by the zoning regulations in effect at the time Avalon submitted its application. All of the other reasons stated by the commission for its denial: traffic safety, town resources, intensity of use, etc., are susceptible to resolution — the commission, as a requirement for approval, may impose reasonable conditions to address what they perceived to be substantial public interests. The record does not show that effort to have been made by the commission and therefore it has failed to meet its burden under § 8-30g(c)(1)(D).
 CONCLUSION
Because none of the commission's stated reasons withstands judicial scrutiny under the affordable housing statute, the court sustains Avalon's appeal and remands this matter to the commission with direction that the applications pertinent to the modified proposal be granted, conditioned upon Avalon's continued compliance with the affordable housing statutory mandates; further, the commission may, as a requirement of approval, impose reasonable and necessary conditions, not inconsistent with this decision, for snow removal, traffic controls and local road improvements.
It is so ordered.
MUNRO, J.