WILLIAM KONIGSBERG ET AL. *v.* BOARD OF ALDERMEN OF THE CITY OF NEW HAVEN ET AL.
(SC 17841)

WILLIAM KONIGSBERG ET AL. *v.* CITY PLAN COMMISSION OF THE CITY OF NEW HAVEN ET AL.
(SC 17842)

Borden, Katz, Palmer, Zarella and Norko, Js.

554

Argued April 11—officially released August 14, 2007

*Joseph P. Williams,* with whom were *Matthew Ranelli* and, on the brief, *Sheila A. Huddleston,* for the appellants (defendants in each case).

*Robert A. Fuller,* with whom was *Bernard A. Pellegrino,* for the appellees (plaintiffs in each case).

*Opinion*

KATZ, J. The present controversy is comprised of two separate zoning appeals brought by the plaintiffs, seven individuals who own residential property in the city of New Haven (city), against the defendants, various city agencies and officials, seeking to prevent the construction of a new school in the East Rock neighborhood of the city.[1] The plaintiffs' first appeal (Docket No. SC 17841) concerns the decision of the city's board of aldermen (board of aldermen) approving amendments to the zoning ordinance and the zoning map of the city, submitted by the New Haven city plan department (plan department) to facilitate the use of certain property for the construction of the school. The plaintiffs' second appeal (Docket No. SC 17842) concerns the decision of the New Haven city plan commission (plan commission) approving a site plan application submitted by the city's board of education (board of education) for the construction of the new school on a site affected by the zoning amendments. Because the site plan application was designed to conform to the amended zoning regulations contested in the first case, the parties agree

[1] William Konigsberg, Anne Schenck, Robin Roush, Gary Witten, Robert King, Ruth King and Margaret Mack are the plaintiffs in both cases. Each claims to be aggrieved by decisions involving the use of property at 691 Whitney Avenue, which is located within 100 feet of their properties. The defendants in the first case are the city's board of aldermen, its mayor, John DeStefano, Jr., and its city plan department. The defendants in the second case are the city plan commission of the city of New Haven, the city's board of education, DeStefano, and the city plan department.

that the validity of the plan commission's approval of the site plan application in the second appeal is conditioned on the validity of the amendments at issue in the first case.

The appeals were consolidated and thereafter tried to the court, *Hon. Anthony V. DeMayo*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgments sustaining the plaintiffs' appeals, concluding that the board of aldermen had abused its discretion by approving amendments that were inconsistent with the city's comprehensive plan and that the plan commission, therefore, improperly approved the site plan application on the basis of the illegal amendments. The court declared null and void each of the zoning amendments in the first case and the site plan approval in the second case. Pursuant to General Statutes § 8-8 (o), the defendants appealed from the judgments of the trial court to the Appellate Court. Thereafter, pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, we transferred the consolidated appeals to this court. We now reverse the judgments of the trial court.

The record in the present case is voluminous. Because the trial court's decision is predicated principally on whether the board of aldermen acted consistently with the substantive limits of its authority under the city's comprehensive plan, we set forth in detail the steps undertaken before the board of aldermen adopted the amendments at issue. The following facts and procedural history are, however, of necessity, edited for efficiency.

We begin with a brief explanation of the authority vested in the defendant city agencies involved in this appeal. The board of aldermen is vested with zoning authority for the city. See 19 Spec. Acts 1006, No. 490 (1925). In this capacity, it is charged with enacting zon-

ing regulations "in accordance with a comprehensive plan" that is designed to, inter alia, "facilitate the adequate provision for . . . schools . . . ." Id., § 2.[2] Pursuant to this grant of authority, the board of aldermen has adopted a zoning ordinance regulating zoning for the city. The plan commission is vested with the responsibility for creating a "comprehensive plan for the systematic and harmonious development of the city . . . ." See 16 Spec. Acts 897, No. 243, § 2 (1913). Pursuant to the city zoning ordinance, the plan commission also is responsible for reviewing regularly the effectiveness and appropriateness of the city zoning ordinance and for making recommendations to the board of aldermen on such changes as it sees fit. See New Haven Zoning Ordinance §§ 61 (c), 64 (a) and (b). The plan department is the professional planning staff of the plan commission.

The present dispute arises from the search for a new location for the Worthington Hooker School (school), which serves the East Rock neighborhood of the city, and historically has been located in that neighborhood. In 1998, in response to requests by families whose children attended the school and as part of a citywide effort to increase the number of neighborhood primary and secondary schools, the board of education expanded the school, which originally had offered only kindergarten through fourth grades, to include grades five

[2] Under the provisions of 19 Spec. Acts 1006, No. 490, § 2 (1925), the board of aldermen's regulations "shall be made in accordance with a comprehensive plan and shall be designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the over-crowding of land; to avoid undue concentration of population; to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality."

through eight. Shortly thereafter, due to overcrowding, the school's facility on Canner Street could not accommodate grades five through eight, and students in those grades had to attend school in a leased building in a nearby neighborhood. Neither facility, however, was up to date in equipment, code compliance or access for persons with disabilities, and neither had off-street student drop-off, staff parking, or sufficient outdoor recreation facilities. Thus, in 1999, a working group comprised of parents of students attending the school, the school principal, and a member of the board of aldermen began looking for new long-term facility options for the school.

Between the fall of 2000 and early 2002, a series of public meetings was conducted regarding the site review process in the East Rock neighborhood. In June, 2001, the working group asked the plan department to evaluate numerous sites that the group had identified in the East Rock neighborhood. The plan department issued a site selection report in December, 2001, after analyzing twenty-two potential sites according to a variety of factors including location, size, traffic, utilities, adjacencies, environmental concerns and displacement of existing homes or businesses. The plan department recommended that the city acquire two adjacent properties—691 Whitney Avenue, which was owned by the Whitney Christian Life Center, a religious institution, and 703 Whitney Avenue, which was owned by the American Red Cross—and build a new facility to accommodate the kindergarten through eighth grades on the combined lots. The recommendation noted, however, that the American Red Cross had claimed that its federal charter rendered its parcel beyond the reach of the city's eminent domain power. The recommendation suggested that, if that were the case, the school site should be limited to the 691 Whitney Avenue parcel.

On January 9, 2002, John DeStefano, Jr., the city's mayor, held a public meeting to review the site selection report's recommendations. The plan commission conducted a public hearing on February 6, 2002, and voted to adopt the site recommendations on March 20, 2002. On April 11, 2002, the citywide school building committee voted to recommend the site at 691 Whitney Avenue, and on May 13, 2002, the board of education approved the recommendation. On June 17, 2003, the plan commission issued an advisory report recommending that the board of aldermen acquire the 691 Whitney Avenue site as part of the school construction program, noting that the abutting 703 Whitney Avenue site had been determined to be unavailable due to American Red Cross' federal charter. The board of aldermen's joint education and community development committee heard the recommendation at that time, and the full board approved the plan commission's recommendation on November 6, 2003. In furtherance of the planned school construction, the city purchased the 691 Whitney Avenue parcel in December, 2003.

Contemporaneous with the school site selection process, the city had been involved in the decennial update of its plan of conservation and development, as required by General Statutes (Rev. to 2003) § 8-23.[3] On October

---

[3] General Statutes (Rev. to 2003) § 8-23 provides in relevant part: "(a) (1) At least once every ten years, the commission shall prepare or amend and shall adopt a plan of conservation and development for the municipality. Following adoption, the commission shall regularly review and maintain such plan. The commission may adopt such geographical, functional or other amendments to the plan or parts of the plan, in accordance with the provisions of this section, as it deems necessary. The commission may, at any time, prepare, amend and adopt plans for the redevelopment and improvement of districts or neighborhoods which, in its judgment, contain special problems or opportunities or show a trend toward lower land values. . . .

"(c) In preparing such plan, the commission or any special committee shall consider the . . . (7) physical, social, economic and governmental conditions and trends . . . [and] (8) the needs of the municipality including, but not limited to, human resources, education, health, housing, recreation, social services, public utilities, public protection, transportation and circula-

15, 2003, the city adopted a new "Comprehensive Plan of Development," which was accompanied by a proposed land use map indicating the planned use of the 691–703 Whitney Avenue parcel as "institutional." The plan noted the need for improved and enlarged educational facilities, and specifically recommended the construction of a new school facility at 691 Whitney Avenue to accommodate the upper grades and the renovation of the Canner Street location for the lower grades.

At the time the city purchased the 691 Whitney Avenue property, the parcel was split-zoned, and the line separating the zones bisected the existing church building on the property.[4] The eastern side of the parcel abutting Everit Street was zoned as residential single

---

tion and cultural and interpersonal communications . . . .

"(d) (1) Such plan of conservation and development shall (A) be a statement of policies, goals and standards for the physical and economic development of the municipality, (B) be designed to promote, with the greatest efficiency and economy, the coordinated development of the municipality and the general welfare and prosperity of its people . . . [and] (C) recommend the most desirable use of land within the municipality for residential, recreational, commercial, industrial, conservation and other purposes . . . .

"(e) Such plan may show the commission's and any special committee's recommendation for . . . (4) the general location, relocation and improvement of public buildings . . . and (8) any other recommendations as will, in the commission's or any special committee's judgment, be beneficial to the municipality. The plan may include any necessary and related maps, explanatory material, photographs, charts or other pertinent data and information relative to the past, present and future trends of the municipality. . . .

"(h) Following adoption of a new plan by the commission, the legislative body of any municipality may hold one or more hearings on the proposed plan and, by resolution, may endorse the plan for the municipality."

In addition to a minor technical change made by No. 03-19, § 20, of the 2003 Public Acts, § 8-23 has since been amended by Public Acts 2005, No. 05-205, § 1 (amending, inter alia, subsection [e] [4] to allow specifically for plan commission's report to include its recommendations for location of schools), Public Acts 2006, No. 06-17, § 1, and Public Acts 2006, No. 06-24, § 1. References herein to § 8-23 are to the 2003 revision.

[4] It is unclear from the record why the parcel was split-zoned. There is evidence in the record, however, that the site has been used as a single religious institution for more than fifty years.

family (RS-1),[5] and the western side of the parcel abutting Whitney Avenue was zoned as residential high-

---

[5] Section 11 of the New Haven zoning ordinance prescribes the rules governing RS-1 districts. Section 11 provides in relevant part: "Description and purpose. These districts exist for the protection of certain fully developed single-family areas of relatively small total size but of unique and irreplaceable value to the community as a whole. The specific purpose of these districts is to stabilize and preserve the low-density residential character of these areas to the maximum possible extent. To this end the use of land and buildings within these areas is limited primarily to single-family homes. The particular character, size and surroundings of these areas create little need for the location within their boundaries of further such non-residential uses as generally support a low-density residential area, and the location of any further such uses within these areas would undesirably limit or diminish the number of homes in them. . . .

"Uses permitted. In an RS-1 District, a building or other structure may be erected, altered, arranged, designed or used, and a lot or structure may be used for any of the following purposes and no other . . . .

"(b) Non-residential uses as follows . . .

"(1) As of right:

"a. Parks and other facilities for passive recreation, and public playgrounds.

"b. Reservoirs, dams, public utility substations and pumping stations, telephone exchanges, police stations, fire stations and post offices . . . .

"(2) Where permitted by special exception under subsection 63 (d) of this ordinance . . . .

"b. Peripheral expansion of existing institutions as follows:

"Any of the following uses of land and/or buildings:

"1. Religious institutions;

"2. Public and private elementary and secondary schools . . .

"3. Private and public colleges and universities (excluding trade and/or business schools); and

"4. Pre-school (nursery and day care center) programs when provided as part of the broader programs of such religious and educational institutions . . . .

"c. When in existence on the effective date of the RS-1 District provisions, items in subsection 11. (b) (2) b. may be further developed and expanded as follows:

"1. Property owned by such an institution in an area designated as an RS-1 District on the effective date of such designation may be used and further developed by the institution owning it for its own religious or educational purposes, as of right, regardless of any other provision of this section 11. By special exception, such property may be used and developed by another religious or educational institution as described above, provided that such other institution shall not be allowed to [be] expanded under clauses 2. and 3. below.

"2. Such an institution either (1) owning property in the RS-1 part of a block designated in whole or in part as an RS-1 District on the effective

density (RH-1).[6] The entire parcel is 2.58 acres, and has been treated as a single parcel for planning and

date of such designation, or (2) owning property in the non-RS-1 part of a block designated in part as an RS-1 District and acquired by the institution in accordance with the zoning regulations applicable to that non-RS-1 part of the block, may expand peripherally into and within the RS-1 part of that block by acquisition and use for its religious or educational purposes of any property that adjoins property owned by it under 11 (b) (1) or 11 (b) (2) above or acquired in accordance with this peripheral expansion provision.

"3. Such an institution may expand across a street in or into an RS-1 District as follows: once 50 [percent] of the land area in the block from which it is expanding (herein called the base block), as well as 75 [percent] of the linear frontage of the base block that abuts a particular adjoining block, is used for religious or educational purposes by one or more such institutions, then any one of such institutions owning and using for its religious or educational purposes 100,000 square feet of land in the base block and 100 feet of its linear frontage abutting the adjoining block may expand across the street into said adjoining block once it acquires and uses for its religious or educational purposes therein (1) as much of the linear frontage of said adjoining block that abuts upon the base block as necessary, when added to any of that frontage already being used by one or more such institutions for religious or educational purposes, to constitute 75 [percent] of that frontage, plus (2) as much additional and adjoining property in said adjoining block, when added to the frontage of the property acquired by the expanding institution, to constitute 100,000 square feet of land.

"4. Any property further developed or acquired by a religious or educational institution under the provisions of this sub-paragraph (c) may be used for religious or educational purposes only if the off-street parking requirements for such institutions stated in the district regulations for RS-2 Districts are met. . . ."

[6] Section 15 of the New Haven zoning ordinance prescribes the rules governing RH-1 districts. At the time of the site review, before the enactment of the amendments at issue in the present case, § 15 provided in relevant part: "Description and purpose. These districts exist for the protection of certain multi-family areas of relatively small total size but of unique and irreplaceable value to the community as a whole. The specific purpose of these districts is to stabilize and preserve the existing residential character of these areas to the maximum possible extent. To this end, the use of land and buildings within these areas is limited primarily to relatively high density residential uses, as the particular character, size, and surroundings of these areas create little need for the location within their boundaries of further other such non-residential uses as generally support a residential area. Moreover, these areas are found especially along major streets traversing large residential sections of the city, and the outward movement of office or other commercial uses along these streets would constitute a serious threat to the residential quality of the areas to either side of them. Encroachment of office or other commercial uses along these streets would violate the spirit of this ordinance and its general purpose and intent and, any other provision

construction purposes since at least 1950, when the church structure currently occupying the site was erected. The church building faces Whitney Avenue but is set back near the center of the parcel. A large paved parking lot occupies most of the rear, eastern portion of the lot bordered by Everit Street.

Running along Whitney Avenue, the RH-1 district is a fully developed area that houses both single-family and multi-family residences, including some large apartment complexes. Established as part of a large scale rezoning of the city in 1963, the RH-1 district was intended, in part, to preserve the distinctive multi-family, primarily residential character of Whitney Avenue, and to prevent commercial encroachment on the urban arterial street. A number of churches, a private school, a private arts center, a fire station and a Planned Parenthood center, as well as other institutional uses are located in the district. Many of the children who live in the RS-1 zones surrounding Whitney Avenue attend the school. Because of the RH-1 district's "relatively small total size but . . . unique and irreplaceable value to the community as a whole," the purpose of the zoning regulations regarding the district is "to stabilize and preserve the existing residential character of these areas to the maximum possible extent." New Haven Zoning Ordinance § 15.

The RH-1 district never has been limited exclusively to residential use. The city zoning ordinance permits,

of this ordinance to the contrary notwithstanding, no variance shall be granted for such uses in these districts. . . .

"Uses permitted. In an RH-1 District a building or other structure may be erected, altered, arranged, designed or used, and a lot or structure may be used for any of the following purposes and no other . . . .

"(b) Non-residential uses as follows . . . . Section 29 relating to parking and all other pertinent sections of the General Provisions for Residence Districts in Article IV shall also apply to all such uses.

"(1) Such non-residential uses as are permitted, and in the same manner, as in RS-1 Districts."

as of right, certain nonresidential uses, such as parks, public utility substations and pumping stations, police and fire stations and post offices. See New Haven Zoning Ordinance §§ 11 (b) (1) and 15 (b) (1). Even prior to the enactment of the amendments at issue in the present case, the expansion of existing religious institutions, public and private elementary and secondary schools, some private and public colleges and preschool programs affiliated with these institutions was permitted either as of right or by special exception. See New Haven Zoning Ordinance §§ 11 (b) (2) and 15 (b) (1); footnotes 5 and 6 of this opinion. Essentially, before the enactment of the presently contested amendments, property used as a religious or educational institution when the RH-1 district was created expressly was permitted to continue in such use, and to develop and expand such use. An existing religious or educational institution was permitted to expand its own use on the same property as of right, and to abutting parcels or parcels across the street by special exception. A subsequent purchaser of a parcel in religious or educational use was permitted to develop the property for its own religious or educational use, including public school use, by special exception. A subsequent purchaser was not permitted, however, to expand its institutional use to adjoining parcels.

Although both RH-1 and RS-1 zones permitted, by special exception, the construction of a school by a subsequent purchaser of a parcel already being used as either an educational or religious institution; see New Haven Zoning Ordinance §§ 11 (b) (1) and 15 (b) (1); the city decided to seek approval to rezone the entire 691 Whitney Avenue parcel as a planned development district under § 65 of the city zoning ordinance. The ordinance allows an owner, lessee, or any governmental agency to file an application to create such a planned development "in instances where tracts of land

of considerable size are developed, redeveloped or renewed as integrated and harmonious units, and where the overall design of such units is so outstanding as to warrant modification of the standards contained elsewhere in [the] ordinance." New Haven Zoning Ordinance § 65 (a).[7]

The board of education undertook an eighteen month design process that incorporated public input before

[7] Section 65 of the New Haven zoning ordinance, which contains extensive requirements for approval of planned developments, provides in relevant part: "(a) Objectives. . . . A planned development, to be eligible under this section, must be:

"(1) In accordance with the comprehensive plans of the city, including all plans for redevelopment and renewal;

"(2) Composed of such uses, and in such proportions, as are most appropriate and necessary for the integrated functioning of the planned development and for the city;

"(3) So designed in its space allocation, orientation, texture, materials, landscaping and other features as to produce an environment of stable and desirable character, complementing the design and values of the surrounding neighborhood, and showing such unusual merit as to reflect credit upon the developer and upon the city . . . .

"(d) Application and general plans. Each application shall state the proposed modifications of existing zoning, and shall be accompanied by general plans, including contoured site plans. The general plans shall show the improvements to be erected upon the tract, the open spaces to be provided, the nature and location of the proposed use or uses, the relationship of the proposed development to surrounding properties, and other pertinent information.

"Traffic impact study. All applications filed pursuant to this section shall be referred to the Department of Traffic and Parking for an advisory report on the traffic impact. The traffic impact study shall show the amount and direction of traffic to be generated by the proposed development and shall estimate the effect of such traffic on the roadway capacity and safety. . . .

"(2) . . . [T]he Application and General Plans shall be filed with the Board of Aldermen and acted upon as a proposed amendment to this ordinance. If such application and General Plans are approved by the Board of Aldermen, following a favorable recommendation by the [plan commission] and after an advisory report from the Department of Traffic and Parking regarding the traffic impact study, upon specific findings that each of the objectives stated in subsection 65 (a) above will be met, such approval shall be construed to amend this ordinance insofar (and only insofar) as specific deletions, additions and changes are made which are related to the land and structures in the tract, and the tract shall be designated as a separate

submitting its planned development district proposal to the board of aldermen in 2004. The board of aldermen referred the application to the plan commission for its advice, and the plan commission conducted an exhaustive planning analysis of the proposal, including a detailed design review of the proposed facility as required by the planned development district's provisions. See footnote 7 of this opinion. After a public hearing, the plan commission issued a report recommending that the board of aldermen approve the board of education 's application to rezone 691 Whitney Avenue as a planned development district for a new school.

Before the board of aldermen had an opportunity to act on the plan commission's recommendation, however, the Appellate Court invalidated § 65 of the city zoning ordinance pertaining to the planned development districts in a case unrelated to the present matter. See *Campion* v. *Board of Aldermen,* 85 Conn. App. 820, 853, 859 A.2d 586 (2004).[8] In light of the Appellate Court's judgment, and because of the urgent need for a new school facility, the board of education withdrew its planned development district application rather than await the outcome of the litigation. The plan department then decided to pursue a two-pronged traditional zoning approach wherein it proposed to amend the zoning ordinance regarding nonresidential development in the RH-1 district,[9] and to amend the zoning map to include the entire parcel at 691 Whitney Avenue within the

Planned Development District provided that the requirements of subsection 65 (e) below [regarding subsequent performance] are met. . . ."

[8] This court subsequently reversed the Appellate Court's judgment. See *Campion* v. *Board of Education,* 278 Conn. 500, 899 A.2d 542 (2006). That decision, however, was not released until after the trial court had rendered the judgments in the present cases.

[9] In fact, the RH-1 district in which the property at issue in this appeal is located is currently the only RH-1 district in the city; it runs north along Whitney Avenue from Edwards Street to the city limits at the Hamden town line.

existing RH-1 district. Although the plan department could have applied for special exceptions in each existing district to construct the school, in proposing to enact permanent zoning changes, it intended to address not only the current need for a new school, but also concerns about the scope of future institutional development in the RH-1 district. Additionally, it hoped to preserve the negotiated design developed in the course of the planned development district process, which had been the result of substantial cooperative efforts.[10] Because the design had been drafted according to the planned development district guidelines, it did not conform precisely to the building standards for RH-1 districts at the time. To this end, the plan department proposed two amendments: an amendment to the zoning ordinance pertaining to the standards for institutional reuse in the RH-1 district (text amendment), and an amendment to the zoning map redrawing the RH-1 district line to include the entire parcel at 691 Whitney Avenue (map amendment), so that it would lay within a single zone and would be governed by a single set of regulations.

---

[10] In a letter to the plan commission accompanying the planned development district application, Robin Golden, chief operating officer of the board of education, highlighted details of the cooperative process. Golden noted therein: "The school's design evolved over the course of many School-Based Building Advisory Committee meetings, beginning in May 2003, and incorporating many suggestions from neighbors in the East Rock area. The three-story classroom wing was moved from the rear of the church to its front, along Whitney Avenue, to maintain a frontage along Whitney [Avenue] and a setback compatible with the adjacent apartment building, resulting in more green space and buffer between the rear of the current church building and Everit Street. Two emergency access pedestrian gates had been proposed, each near the property line of adjoining Everit Street residences; they were merged into one pedestrian gate, in the center of the property, away from the residences. Fencing is proposed that maintains privacy between the residences and the school property. The gymnasium and the classroom wall facing the adjacent apartment building do not have windows, so that students will not be able to look into the windows of nearby apartments. . . . The building design, with input from many, is intended to make the best use of the site for the school and the neighborhood."

The text amendment would permit specific types of institutional reuse of properties in RH-1 zones that were at least one acre in size and were in educational or religious institutional use on October 15, 2003, when the city adopted its current comprehensive plan of development.[11] In other words, the amendment would permit a subsequent purchaser of property currently used for institutional purposes to use the property for its own specified institutional purposes as of right, rather than by special exception only, as provided in the existing ordinance. It did not authorize the conversion of properties in residential use to institutional use, nor did it allow the encroachment of commercial uses. The amendment provided building requirements for institutional development of the eligible parcels, instituting a maximum average height requirement, and restricting total building coverage to 30 percent of the lot area, consistent with the regulations of the surrounding RS-1 districts. The text amendment would

---

[11] Specifically, the proposed amendment added the following text to § 15 (b) of the New Haven zoning ordinance, which dictates permitted nonresidential uses in the RH-1 district:

"2. On lots in use for any of the uses described in Section 11 (b) (2) (b) on or before October 15, 2003, any of the uses described in Section 11 (b) (2) (b) (1), (2) or (4) excluding dormitories, fraternities and sororities.

"BUILDING REQUIREMENTS.

"(a) Minimum lot area—One acre;

"(b) Minimum side yard—One at least [ten feet] and the other at least [twelve] feet, notwithstanding the requirements of Section 15 (a) (1) (d);

"(c) Maximum building height—Such height shall not exceed either four stories or an average height of [fifty] feet;

"(d) Maximum building coverage—Total building coverage for principal building or buildings not to exceed 30 percent of lot area;

"(e) Maximum gross floor area—No building or buildings shall have a gross floor area greater than 0.6 times the lot area equivalent to a maximum floor area ratio of 0.6; and

"(f) Minimum parking—One (1) parking space for each eight (8) seats in each place of assembly commonly having events open to the public, based upon the maximum occupancy of both fixed and movable seats, located on the same lot or within 300 feet walking distance on a separate lot in the district."

modify only the regulations for RH-1 districts; the regulations controlling nonresidential use in RS-1 districts would not be affected. According to the plan department's review, because of the one acre minimum lot requirement, of the thirteen existing parcels categorized as institutional in the RH-1 district, only six were being used as religious or educational institutions and thus could be eligible for institutional conversion if the building requirements were satisfied.[12] Thus, the potential effect of this text amendment on the RH-1 district was circumscribed by its terms. The map amendment would affect only the rear, eastern portion of the parcel at 691 Whitney Avenue, which the amendment rezoned from RS-1 to RH-1, to conform to the zoning of the front, western portion of the parcel.

On February 1, 2005, Karyn Gilvarg, the executive director of the plan department submitted applications for the proposed amendments to the board of aldermen. Therein, with respect to the text amendment, Gilvarg explained: "[T]he proposal amends the ordinance to make it clear that existing institutional properties may be used as-of-right for elementary and secondary schools, religious institutions and pre-school programs subject to the proposed building requirements. . . . This proposal was prompted in part by the recent application to locate the [school] at 691 Whitney Avenue using a planned development district, which . . . will be withdrawn. That application prompted [the plan department] to examine the potential benefits of allowing the re-use of existing institutional properties located in the RH-1 zone for other institutional uses which currently exist in that zone. . . . The proposed [o]rdinance allows properties with institutional uses to be re-used by other acceptable institutional uses which will not disturb the tenor of the neighborhood. Such

---

[12] The defendants further claim that of these six properties, only four meet the one acre lot minimum.

institutional uses provide a benefit to the residential community in which they are located and in turn benefit from being located in such a community. In this manner, the existing institutional properties in the RH-1 zone may be re-used to continue to meet the needs of the community." With regard to the map amendment, Gilvarg noted in the application: "The proposed map amendment is consistent with the Comprehensive Plan of Development which identifies institutional use as the most desirable use for the entire parcel located at 691 Whitney Avenue (without distinction for the portion of the parcel located within the RS-1 zone). The Comprehensive Plan of Development also anticipates that 691 Whitney Avenue will be used for educational purposes. Therefore, [the plan department] requests that this parcel be rezoned so that planning for this property is conducted under a single zoning designation: RH-1." In accordance with the prescribed procedure for amending the zoning ordinance,[13] the board of aldermen referred the proposals to the plan commission for its recommendations.

The plan commission held a public hearing on the proposed amendments on March 23, 2005. At the hearing, Gilvarg presented analyses of the proposed changes and explained that the policy based objectives of the amendments were: to respect the area's existing resi-

---

[13] The procedure for amending the city zoning regulations is prescribed in the 1925 Special Act that vested the board of aldermen with zoning authority for the city. "The regulations imposed and the districts created under the provisions of this act may be changed or altered from time to time by ordinance, but no such change or alteration shall be made until the proposed change shall have been referred to the [plan commission] for a hearing. Said commission shall, upon receipt from the board of aldermen of such proposed change, give notice and proceed with a [public] hearing in the same manner as is herein provided and shall report to said board of aldermen its recommendations in the matter, within thirty days after receipt by it of the proposal for a change. Thereafter the board of aldermen may, by ordinance adopted in the usual manner, make the proposed change." 19 Spec. Acts 1006, No. 490, § 5 (1925).

dential and institutional balance; to establish institutional development standards harmonious with the existing development pattern; and to enable the construction of a new school at 691 Whitney Avenue. Gilvarg also provided an explanation of each of the new building standards proposed in the text amendment.

An attorney for the board of education testified in support of the amendments, citing reasons for their approval including: advancing the goals of the comprehensive plan of development; advancing the public interest through the creation of a needed public school; furthering the intent of the RH-1 district by being complementary to and supportive of the existing residential use through the construction of a community school; and, with respect to the map amendment, correcting the zoning line to conform with the property line and maintaining the property's current institutional use. Edward Mattison, a member of the board of aldermen representing the tenth ward in the East Rock neighborhood, also testified in favor of the amendments.

Following this testimony, a member of the plan commission questioned the board of education's attorney regarding charges by opponents that the proposed amendments constituted improper spot zoning.[14] Community residents then were permitted to question Gilvarg, the board of education's attorney and the school construction coordinator, and numerous citizens took advantage of this opportunity. The meeting was then opened for public comment. In total, approximately thirty-eight members of the community testified regarding their views of the proposal.

Bernard Pellegrino, the attorney representing the plaintiffs in the present case, presented testimony against the proposal, and Norman Cole, a city planner for the city of Stamford, testified as an expert on behalf

---

[14] We address the issue of spot zoning in part I of this opinion.

of the plaintiffs. Essentially, Pellegrino and Cole argued that the amendments should not be approved and that the board of education should be required to obtain special exceptions to use the split-zoned property for the new school. Cole testified that, in his opinion, the rezoning proposed in the map amendment and the institutional reuse allowance in the text amendments were improper, extreme measures under the circumstances, and not in keeping with common zoning practice. Upon questioning from a member of the plan commission, however, Cole admitted that, in the course of his experience in Stamford, he had recommended the rezoning of a single parcel for the sake of implementation of Stamford's master plan, rather than the utilization of a variance or special exception to achieve the same goal, as he had suggested would have been the proper practice in the present case. Additionally, he admitted that, although he had testified that the allowance of institutional use as of right in a residential district was "extraordinary," Stamford, in fact, did allow institutional use as of right in certain areas.

On April 6, 2005, the plan commission, by a vote of four to zero, with one abstention, adopted the detailed advisory reports recommending the proposed map and text amendments for approval by the board of aldermen. In addition to adopting the advisory reports outlining the history leading to the proposal, the policy based planning considerations, and the impact of the proposed amendment in light of the existing policies expressed in § 15 of the zoning ordinance concerning the RH-1 district, the plan commission expressly found that the proposed amendment was "[c]onsistent with the comprehensive plan of development . . . in the public interest; [and promoted] the health, safety and general welfare of the community . . . ." In the report analyzing the zone change proposed by the map amendment, after noting the peculiarity of the split-zoned

nature of the 691 Whitney Avenue parcel and the attendant zoning complications, the plan commission observed that, "[w]ith regard to the comprehensive plan, as [reflected in] the zoning map . . . the RH-1 district generally parallels RS-1 pertaining to non-residential uses . . . [and the] RH-1 zoning line generally follows the 'rear of property line' concept for parcels facing Whitney Avenue." In conclusion, the plan commission found that, "[t]he extension of the RH-1 zoning line is consistent with the comprehensive plan and zoning scheme since (a) the new line follows an established rear of property line; (b) the use is institutional in nature (consistent with other institutional uses operating on both main and side streets); (c) the RS-1 district for this block of Everit Street is a blend of single-family and higher density uses; and (d) the main structure and other [existing] improvements bisect the existing zoning line and operate as a single unit. . . . [And, therefore] the proposed zoning map amendment . . . [is] consistent with the comprehensive plan of development . . . in the public interest . . . [and] promote[s] the health, safety and general welfare of the community . . . ."

The board of aldermen's joint committee on community development and legislation held a public hearing on the proposed amendments on April 11, 2005, very similar to the plan commission's previous public hearing. Again, Gilvarg delivered a detailed presentation on the proposed amendments and the planning and policy justifications for each. She also explained changes to the proposed amendments that had been made based on the plan commission's recommendations, including: modifying the proposed language regarding parking provisions; adding a savings clause specifying that the zoning ordinance would remain in full force and effect except as amended; and inserting language regarding the effective date of the amendment, based on the date

of approval of the board of aldermen. An attorney for the board of education gave a presentation, and a member of the board of aldermen spoke in favor of the amendments and their ability to address his concern about future development in the East Rock neighborhood. Members of the public also were permitted to question Gilvarg and the board of education representatives and to present testimony in favor of and against the proposed amendments.

On May 16, 2005, the full board of aldermen voted to approve the text and map amendments, including the modifications, with twenty-three members voting in favor of the amendments, three members abstaining, and none opposing. In so acting, the board of aldermen adopted the reasons for their enactment listed in the prefaces to the amendments. With respect to the text amendment, those reasons included that: (1) the character and vitality of the city's neighborhoods were dependent upon a mix of harmonious uses, and that elementary and secondary schools, preschools and religious institutions were vital to residential areas; (2) the RH-1 district already housed educational and religious institutions and allowing the conversion of such institutional properties to other such properties was consistent with and would stabilize the tenor of the neighborhood; (3) the proposed building requirements allowed only appropriate structures and facilities; and (4) the amendments served a substantial government interest, were in the public interest and promoted the health, safety and general welfare of the community. With respect to the map amendment, the stated reasons included that: (1) residents of the school neighborhood had expressed a desire to locate a new facility at 691 Whitney Avenue; (2) the parcel was located within two zoning designations; (3) the parcel was currently in institutional use; (4) the use of the entire parcel for institutional use was consistent with the tenor of the

neighborhood, which included religious and educational uses in the immediate vicinity; (5) the parcel had been and continued to be a single parcel and was characterized for use as such for planning purposes; and (6) the use of the parcel for religious or educational use was consistent with the comprehensive plan of development, which expressly proposed institutional use of the parcel for educational purposes on its proposed land use map. Notice of the board of aldermen's decision was timely published in The New Haven Register on June 1, 2005.

The plaintiffs subsequently filed an appeal challenging the board of aldermen's approval of the zoning amendments. See *Konigsberg* v. *Board of Aldermen*, Superior Court, judicial district of New Haven, Docket No. NNH-CV-05-4012350-S (June 28, 2005). The plaintiffs did not seek to enjoin the plan commission from acting on site plan applications submitted in accordance with the amended zoning ordinance at that time.

On June 23, 2005, the board of education filed its site plan application with the plan commission for site plan and coastal site plan approval for the construction of a new school at 691 Whitney Avenue. The site plan was tailored to comply with the newly amended § 15 of the city zoning ordinance,[15] governing the RH-1 district

---

[15] The site plan application was drafted to comply with § 15 (b) (2) of the New Haven zoning ordinance. Because that section incorporates by reference parts of § 15 (a) (1) of the New Haven zoning ordinance, we include the relevant parts of that section herein. At the time the site plan application was submitted, therefore, § 15 provided in relevant part:

"Uses permitted. In an RH-1 District, a building or other structure may be erected, altered, arranged, designed or used, and a lot or structure may be used for any of the following purposes and no other:

"(a) Residential uses as follows. . . .

"(1) . . . Building requirements . . . .

"b. Minimum average lot width: [sixty feet] . . . .

"d. Maximum building height: No direct limit.

"Provided that no point on a side or rear building wall shall be so located that it is closer to a side or rear lot line than one foot for each two feet that such point is above the average finished lot grade along such side or rear building wall. But the more flexible rules of section 30 of this ordinance may be followed in lieu of this proviso, at the option of the owner.

within which the entire parcel at 691 Whitney Avenue then lay as a result of the map amendment. The site plan called for the construction of a new classroom building and gymnasium on the site, and the preservation and incorporation of the existing church building for use as an auditorium and cafeteria. The proposed classroom building, fronting on Whitney Avenue, would be three stories tall and would be located in front of

"e. Minimum yards:

"Front—[twenty-five feet], except that where 75 [percent] or more of the entire street frontage (in feet) on the same side of the same street between the nearest two intersecting streets has been developed with buildings with front yards smaller than [twenty-five] feet, the required front yard shall be the same as the yard presently followed by existing buildings along the greatest quantity of street frontage (in feet). Provided that, the front yard shall in any case be increased if necessary to maintain a ratio of one foot between the front building wall and the center line of the street to two feet of average height measured along the front building wall, except as provided in subsection 30 (b).

"Rear—[twenty-five feet]. . . .

"(b) Non-residential uses as follows: The standards in paragraph (a) (1) above relating to minimum lot area, minimum average lot width, maximum building coverage, maximum building height, minimum yards, and maximum gross floor area shall apply to non-residential uses except as indicated below. . . .

"(2) On lots in use for any of the uses described in section 11 (b) (2) (b) on or before October 15, 2003, any of the uses described in section 11 (b) (2) (b) (1), (2) or (4) excluding dormitories, fraternities and sororities.

"Building requirements.

"a. Minimum lot area: One acre;

"b. Minimum side yard: One at least [ten feet] and the other at least [twelve] feet, notwithstanding the requirements of section 15 (a) (1) (d);

"c. Maximum building height: Such height shall not exceed either four stories or an average height of [fifty] feet;

"d. Maximum building coverage: Total building coverage for principal building or buildings not to exceed 30 percent of lot area;

"e. Maximum gross floor area: No building or buildings shall have a gross floor area greater than 0.6 times the lot area equivalent to a maximum floor area ratio of 0.6; and

"f. Minimum parking: The greater of one (1) parking space for each eight (8) seats in each place of assembly commonly having events open to the public, based on the maximum occupancy of both fixed and movable seats; or one (1) parking space for each full-time equivalent staff person, located on the same lot or within 300 feet walking distance on a separate lot in the district, shall be provided."

Section 11 (b) (2) (b) (1) and (2) of the New Haven zoning ordinance, incorporated by reference in § 15 (b) (2), specifically permits nonresidential uses in the form of religious institutions and public and private elementary and secondary schools. See footnote 5 of this opinion.

the church building, to which it would be attached, with the gymnasium to be built to the south of the existing church building, to which it also would be attached. Vehicular access to the site would be from Whitney Avenue only, with the driveway entry controlled by a new traffic signal. As required by fire department regulations, there would be a pedestrian access gate on Everit Street for use in emergencies. The plan also included a six foot chain link fence with a landscaped buffer along the north and south property lines, and a wooden fence with a landscaped buffer along the Everit Street boundary.

The plan commission conducted a duly noticed public meeting regarding the application on July 20, 2005. At the meeting, the plan commission reviewed a draft report on the application prepared by its staff and heard testimony from William F. Moore, the project architect. Moore detailed the application's compliance with the pertinent RH-1 zoning regulations.[16] The site plan application was submitted with all of the required engineering, architectural and environmental attachments.

Plan commission members questioned Moore about their concerns regarding the sidewalks on Everit Street, the buffers between the school and adjacent residential properties, access to the site from Everit Street, the

[16] Specifically, Moore explained that: the site is currently in institutional use as a church and the intended new institutional use is permitted; the lot size is 2.58 acres, well exceeding the one acre minimum; the overall average height of the building is forty-nine feet, within the fifty foot maximum average; the plan is well within the setback, side and rear yard requirements with no building closer to Everit Street than the existing church; the lot coverage for the plan is 25.6 percent, under the 30 percent maximum; the floor area ratio of the design is 0.56, less than the 0.6 maximum; and the design includes forty-four parking spaces, providing parking that accommodates the 352 seat auditorium at a ration of one space for each eight seats. See footnote 15 of this opinion. Moore noted that, in addition, the playing field on the site could accommodate forty-four additional cars for special occasions, and that the neighboring American Red Cross had agreed to share its parking lot on evenings and weekends on an "as available" basis.

timing of garbage collection, recreational facilities at the school, the appearance of a planned mechanical attic, and the location of utility lines and crosswalk configuration. No evidence was presented refuting Moore's testimony regarding the application's compliance with the zoning ordinance, and no one spoke in opposition to the plan.

The plan commission then voted unanimously to approve the site plan application. In so acting, it approved and adopted the report prepared by its reviewing staff as the plan commission's statement of factual findings and reasons for its decision. Specifically, the report found: "The [plan commission] concurs [that] the site plan meets all the requirements of the RH-1 zone and is in conformance with the City's Comprehensive Plan of Development." The report additionally noted that, "[t]he proposed plan attempts to minimize the impact on the adjacent Everit Street residential neighborhood and protects and preserves the two existing beech trees and the historic structure on site. The new school buildings will harmonize with Whitney Avenue's built environment of mixed institutional and residential uses." Finally, the report noted that, "[p]lans have been reviewed by the Site Plan Review team with representatives from City Plan, City Engineer, Livable City Initiative Building Division and Department of Traffic and Parking and have been found to meet the requirements of City ordinances, Regulations and standard details" subject to comments regarding issues that had been raised at the meeting, including: paving, crosswalk and sidewalk considerations on Whitney Avenue and Everit Street; finalization of the new traffic signal, driveway, crosswalks and sidewalks with the traffic and parking department; scheduling of garbage collection hours to avoid neighborhood disturbance; the possible addition of a playground to the site plan; and matters regarding site lighting, signage and

on-site parking plan for special events. The plan commission required that the issuance of a building permit be conditioned on the finalization of these issues as well as, inter alia, a sign off on the final plans by the fire marshal, city engineer, department of traffic and parking and plan department. These comments were part of eight standard items listed as conditions of approval in the report.

The plan commission timely published notice of its decision in The New Haven Register on July 26, 2005. The plaintiffs, whose appeal of the board of aldermen's approval of the amendments already was pending before the trial court, then filed a second appeal from the plan commission's approval of the site plan, which included a motion to enjoin the plan commission from considering any application for development or permitting construction at 691 Whitney Avenue. See *Konigsberg* v. *City Plan Commission*, Superior Court, judicial district of New Haven, Docket No. NNH-CV-05-4014153-S (August 18, 2005).

The appeals were consolidated and, thereafter, the court, *Hon. Anthony V. DeMayo*, judge trial referee, issued a single memorandum of decision sustaining both appeals. The court found, inter alia, that the amendments were not consistent with the city's comprehensive plan, that they jeopardized the character of the RH-1 and RS-1 districts, and that the map amendment constituted spot zoning. With respect to the site plan application, the court held that, despite the limited scope of review applicable to site plan application evaluation, the plan commission should not have approved the site plan because it was predicated on the improper amendments and ignored the "intent" of the sections of the zoning ordinance concerning RH-1 districts, RS-1 districts, and nonconforming uses. The court declared the zoning amendments null and void, and likewise vacated the site plan approval in the second appeal.

The defendants in both cases then appealed from the decision of the trial court.

In the appeal regarding the zoning amendments, the defendants claim that the trial court failed to apply the proper standard of review and improperly substituted its own judgment and findings for those of the board of aldermen. The plaintiffs claim that trial court properly determined that the decision of the board of aldermen approving the amendments constituted an abuse of discretion and, therefore, that the judgment of the trial court vacating the board of aldermen's decision should be affirmed. In the appeal concerning the site plan application, the defendants claim that the trial court failed to apply the proper standard of review and relied on impermissible factors in reversing the plan commission's approval of the site plan. The plaintiffs claim that the trial court properly sustained their appeal from the plan commission's approval of the site plan because the zoning amendment on which the plan commission's approval was conditioned was invalid and, in any event, did not permit the construction of the school in the RH-1 zone. We agree with the defendants in both cases and we reverse the judgments of the trial court.

I

We consider first the propriety of the trial court's judgment sustaining the plaintiffs' appeal from the board of aldermen's decision approving the amendments to the city's zoning ordinance and zoning map. As a threshold matter, we note that both the text amendment to the zoning ordinance and the zoning change in the map amendment constitute decisions of the board of aldermen acting in its legislative capacity. See, e.g., *Arnold Bernhard & Co.* v. *Planning & Zoning Commission*, 194 Conn. 152, 164, 479 A.2d 801 (1984) ("[i]n adopting or amending zoning regulations, the commission acts in a legislative capacity"); *First Hartford*

*Realty Corp.* v. *Plan & Zoning Commission*, 165 Conn. 533, 540, 338 A.2d 490 (1973) ("[i]n rezoning the property . . . the commission acted as a legislative body").

The standard of review according to which courts must analyze challenges to legislative decisions of local zoning authorities is well settled. "In such circumstances, it is not the function of the court to retry the case. Conclusions reached by the [zoning authority] must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency. *O'Donnell* v. *Police Commission*, 174 Conn. 422, [426] 389 A.2d 739 [1978]; *Balch Pontiac-Buick, Inc.* v. *Commissioner of Motor Vehicles*, 165 Conn. 559, 563, 345 A.2d 520 [1973]. The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached. *Conley* v. *Board of Education*, 143 Conn. 488, 492, 123 A.2d 747 [1956]." *Calandro* v. *Zoning Commission*, 176 Conn. 439, 440, 408 A.2d 229 (1979); accord *Primerica* v. *Planning & Zoning Commission*, 211 Conn. 85, 96, 558 A.2d 646 (1989); see also *Goldberg* v. *Zoning Commission*, 173 Conn. 23, 26, 376 A.2d 385 (1977) (legislative action of zoning commission should be upheld if "even one" of commission's stated reasons is sufficient to support decision). As this court previously has explained, "[t]he courts allow zoning authorities this discretion in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions [that] create the problem and shape the solution." *Burnham* v. *Planning & Zoning Commission*, 189 Conn. 261, 266, 455 A.2d 339 (1983).

This court recently has reiterated that, "[a]cting in such legislative capacity, the local board is free to amend its regulations whenever time, experience, and

responsible planning for contemporary or future conditions reasonably indicate the need for a change. . . . The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function. . . . This legislative discretion is wide and liberal, and must not be disturbed by the courts unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally. . . . Zoning must be sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission. Courts will not interfere with these local legislative decisions unless the action taken is clearly contrary to law or in abuse of discretion. . . . Within these broad parameters, [t]he test of the [legislative] action of the commission is twofold: (1) The zone change must be in accord with a comprehensive plan . . . and (2) it must be reasonably related to the normal police power purposes enumerated in [the city's enabling legislation] . . . ." (Internal quotation marks omitted.) *Campion* v. *Board of Aldermen*, 278 Conn. 500, 527, 899 A.2d 542 (2006). In addition, the plaintiffs bear the burden of establishing that the board of aldermen acted improperly. *Wood* v. *Zoning Board of Appeals*, 258 Conn. 691, 698, 784 A.2d 354 (2001); *Bloom* v. *Zoning Board of Appeals*, 233 Conn. 198, 206, 658 A.2d 559 (1995); *Francini* v. *Zoning Board of Appeals*, 228 Conn. 785, 791, 639 A.2d 519 (1994). Finally, in our review of the board of aldermen's decision to amend the zoning ordinance, we are mindful that, "[e]very intendment is to be made in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established

beyond a reasonable doubt." (Internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 289–90, 545 A.2d 530 (1988). Thus, if the decision of the board of aldermen to amend the zoning regulations reasonably was supported by evidence in the record, in accordance with the comprehensive plan for the city and related to the police power enumerated in the city's zoning ordinance, it must be upheld on appeal. We conclude that the board of aldermen acted well within its authority in the present case.

We begin by addressing the police power prong of the test, as there can be no doubt, and indeed it is undisputed in the present case, that the provision of public schools is an integral part of the police power of local authorities. Article eighth, § 1, of the constitution of Connecticut provides that, "[t]here shall always be free public elementary and secondary schools in the state" and delegates the implementation of this provision to the General Assembly. As we have discussed previously, in the Special Act endowing the board of aldermen with the zoning authority for the city, the General Assembly directed that zoning regulations be made, inter alia, "to facilitate the adequate provision for . . . schools." 19 Spec. Acts 1006, No. 490, § 2 (1925); see footnote 2 of this opinion; see also General Statutes § 8-2 (a) (authorizing local zoning commissions to enact regulations to facilitate adequate provision of schools). In the present case, as is demonstrated adequately by the record, the text and map amendments were approved as part of a plan to facilitate the construction of a school at 691 Whitney Avenue. The board of aldermen's action, therefore, was reasonably related to its normal police power as the zoning authority for the city.

The concept of a comprehensive plan has been described broadly by the courts. "A comprehensive plan

has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to the present and potential use of the properties. . . . The requirement of a comprehensive plan is generally satisfied when the zoning authority acts with the intention of promoting the best interests of the entire community." (Citation omitted; internal quotation marks omitted.) *First Hartford Realty Corp.* v. *Plan & Zoning Commission*, supra, 165 Conn. 541. It is established that "the comprehensive plan is to be found in the zoning regulations themselves and the zoning map, which are primarily concerned with the use of property." *Damick* v. *Planning & Zoning Commission*, 158 Conn. 78, 81, 256 A.2d 428 (1969); see also *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 551, 600 A.2d 757 (1991) ("[i]n the absence of a formally adopted comprehensive plan, a town's comprehensive plan is to be found in the scheme of the zoning regulations themselves" [internal quotation marks omitted]). In order to determine, therefore, whether the board of aldermen's approval of the zoning amendments was in accordance with the comprehensive plan and in the best interests of the community, we look to the general scheme outlined in the city's zoning ordinance.

Section 64 of the zoning ordinance describes the procedure to be undertaken for its amendment.[17] That section outlines the "various factors [that should be taken into account] favoring and disfavoring a change, such as, but not limited to . . . changes that have taken place in the city and in patterns of construction and land

---

[17] This court has stated that, "[c]ompliance with the statutory procedure is a prerequisite to any valid change in zonal boundaries"; *Couch* v. *Zoning Commission*, 141 Conn. 349, 356, 106 A.2d 173 (1954); however, there is no claim of noncompliance with procedural mandates in the present case.

use, the supply of land and its [particular] suitability for various purposes, the effect of a map change on the surrounding area, [and] the purposes of zoning and the comprehensive plan . . . ." New Haven Zoning Ordinance § 64 (d) (2) (a).

There is ample evidence in the record to support the board of aldermen's decision to amend the zoning ordinance in accordance with this standard. As we have discussed, the plan department, the plan commission and the board of aldermen considered, inter alia, the increased enrollment in the city's schools; the acute need for a new school facility; the city's express policy of providing neighborhood schools and the concomitant statutory duty of the board of aldermen, in its capacity as the zoning authority for the city, to provide public schools; the limited supply of appropriate sites in an urban neighborhood; and the particular suitability of the 691 Whitney Avenue parcel, which already had been in institutional use. In the exhaustive site search, twenty-two sites were considered based on a variety of factors and the selected parcel was recommended by the plan department as the most appropriate site available.

In addition, there was evidence that the plan commission and the board of aldermen had considered the particular character of the RH-1 and RS-1 districts in their site evaluation and planning. Section 15 of the New Haven zoning ordinance sets forth the statement of purpose for RH-1 districts, providing in relevant part: "These districts exist for the protection of certain multi-family areas of relatively small total size but of unique and irreplaceable value to the community as a whole. The specific purpose of these districts is to stabilize and preserve the *existing* residential character of these areas to the maximum possible extent. To this end, the use of land and buildings within these areas is limited *primarily* to relatively high density residential uses, as

the particular character, size and surroundings of these areas create little need for the location within their boundaries of *further* other such non-residential uses as generally support a residential area. Moreover, these areas are found especially along major streets traversing large residential sections of the city, and the outward movement of *office* or other *commercial* uses along these streets would constitute a serious threat to the residential quality of the areas on either side of them. Encroachment of office or other commercial uses along these streets would violate the spirit of this ordinance and its general purpose and intent and, any other provision of this ordinance to the contrary notwithstanding, no variance shall be granted for such uses in these districts. . . ." (Emphasis added.) The statement of purpose regarding RS-1 districts in § 11 of the New Haven zoning ordinance tracks this language almost verbatim. See footnote 5 of this opinion.

This language unambiguously indicates that existing residential uses in RH-1 districts are to be preserved and that commercial uses are prohibited. The text amendment adopted by the board of aldermen in the present case does not permit the conversion of existing residential uses to institutional uses or allow the creation of new institutional uses on sites not currently in institutional use. Moreover, it does not permit the encroachment of commercial uses into the district. Rather, it authorizes the conversion, as of right,[18] of

---

[18] We find no support for the trial court's finding that the amendment providing as of right institutional conversion in the RH-1 districts jeopardizes the rights of the property owners in the RS-1 districts, in which successive owners must apply for special exceptions in order to develop previously institutional RS-1 properties for their own religious or educational uses. See footnote 5 of this opinion. As we have discussed previously, the text amendment does not alter the regulation of RS-1 property in any manner. Additionally, we note that the map amendment converted only a small parcel, which had been in institutional use for more than fifty years, from an RS-1 district to an RH-1 district. We do not agree that this conversion alone could result in any substantial infringement of the rights of RS-1 district property owners.

existing permitted institutional uses to certain other permitted institutional uses by successive owners, subject to meeting the specified building requirements for those uses.[19] Thus, the existing residential space is stabilized and preserved in accordance with the statement of purpose for the RH-1 district.

In addition, although § 15 of the New Haven zoning ordinance indicates that the nature of these districts is

[19] We note that, contrary to the claim of the plaintiffs and the reasoning of the trial court, the institutional uses at issue in the present case are not nonconforming uses in either the RS-1 or RH-1 districts. Even prior to the amendment at issue, under the city zoning ordinance, educational and religious uses expressly were permitted both in the RH-1 and RS-1 districts and the conversion of these uses to other educational or religious uses by successive owners of the subject properties was permitted by special exception. See footnotes 5 and 6 of this opinion. Although the trial court quoted at length from § 67 of the New Haven zoning ordinance, which regulates nonconforming uses, we note that § 67 (c) (10) provides in relevant part: "No use shall be deemed a nonconforming use if located within a district in which a special exception may be granted for such a use under this ordinance. Subsection 63 (d) shall govern as to the expansion or substantial alteration of such uses . . . ." See also *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 215–16, 779 A.2d 750 (2001) ("A special permit allows a property owner to use his property in a manner expressly permitted by local zoning regulations. . . . The proposed use, however, must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values." [Internal quotation marks omitted.]); *Melody* v. *Zoning Board of Appeals*, 158 Conn. 516, 519–20, 264 A.2d 572 (1969) (stating that question of whether use is permitted or nonconforming "is one of expressed intent as stated in the zoning regulations, which are basically legislative enactments, and such intent must be found from intent expressed in regulations construed as a whole," and concluding that plaintiffs' service station was permitted use under local ordinance expressly providing that service stations in existence at time of its enactment were permitted).

Finally, the plaintiffs' reliance on the summary use table in the zoning ordinance to support this contention is unavailing. Although the table indicates that primary and secondary schools are not permitted in the RS-1 and RH-1 districts, this language contradicts the express language of the ordinance, and the summary use table is qualified by a caveat in its heading that cautions: "This summary schedule is for convenience in use of the ordinance. In case of conflict, the District Regulations shall prevail." New Haven Zoning Ordinance, table 1, p. III-36.

such that there is "little need" for additional nonresidential uses, such as elementary schools, which normally support a residential area, the ordinance does not state expressly or even suggest that there is no need for any such supporting institutions, or that such existing uses should be converted to residential uses. Rather, existing religious and educational uses are permitted expressly by the ordinance. Because the RH-1 district, though primarily residential, always has permitted educational and religious institutions, one reasonably may infer that such uses were deemed harmonious with the comprehensive plan. There was ample evidence in the record reflecting the need for a new school in the East Rock neighborhood. Indeed, residents of the neighborhood were the original proponents of the search for an appropriate site for a new school facility. There can be little doubt that the location of a local elementary school within the neighborhood from which it draws its students is in the best interest of the community that it serves.

The record contains further evidence that the building restrictions imposed by the amendment were addressed to the specific concern of minimizing the impact of any new construction and preserving the tenor of the neighborhood. The imposition of a height limitation was of particular concern to a member of the board of aldermen representing the East Rock neighborhood, who expressed concern that existing religious institutions, facing dwindling congregations, would be forced to sell to residential developers who would build large apartment complexes that, as residential uses, would have no height limitation under the ordinance. In addition to expressing his belief that allowing institutional reuse subject to height limitations would stabilize and protect the neighborhood, he opined that the height restrictions should be extended in the future to apply to residential use as well.

This brings us to the trial court's reliance on a singular piece of evidence. In support of its decision, the court cited a computer generated "photo-image" in the record purported to represent the "completed site," which was submitted by James Nowak, a certified public accountant who resided in the East Rock neighborhood and opposed the amendments. "[S]truck by the sheer mass of the project in light of the description and purpose of the RS-1 district," the court found that the amendment "represent[ed] such a drastic departure for the rezoned section of 691 [Whitney Avenue] that the court [was compelled to] conclude [that] the RS-1 district[20] [would] be neither protected, stabilized nor retain its character." Although Nowak had claimed that this rendering was based on architectural plans for the proposed school, three professional architects, including the city's chief planner, the architect hired to construct the school and an architect from the Yale School of Architecture, had disputed its accuracy.[21] Notably, Moore, the project architect, had testified at the public meeting held by the board of aldermen that, "the drawings or photographs you were shown . . . were based on terribly outdated information, and . . . that outdated information, in turn, has been grossly misrepresented and inaccurately portrayed . . . in terms of any number of

---

[20] As we previously have indicated, we disagree that the amendment rezoning the eastern portion of the 691 Whitney Avenue parcel from RH-1 to RS-1 jeopardized the character of the remaining RS-1 districts. In addition, because the text amendment applied only to the RH-1 district, we do not agree that its enactment had any measurable impact on the tenor of the RS-1 districts surrounding it.

[21] In addition, we note that, upon this court's inspection of Nowak's rendering, it is clear that his portrayal cannot be an accurate representation of the city's planned school construction. The structure depicted in the photograph obviously is noncompliant with the maximum height and side yard standards mandated by the amendment, as well as the setback requirement for RH-1 construction, which remains unchanged by the amendment. The site application and all of the supporting documentation in the record confirm that the proposed construction conformed entirely to the building and site requirements in the amended version of the ordinance.

details, [and] . . . it appears to be a terrible misrepresentation of our intent as the architects for the school."

In approving the amendments, the board of aldermen evidently was persuaded that the testimony of the project architect and the chief city planner was more credible than the computer generated image submitted by Nowak. As we have discussed previously, "credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency." *Roncari Industries, Inc.* v. *Planning & Zoning Commission*, 281 Conn. 66, 80, 912 A.2d 1008 (2007). In examining the record and substituting its judgment for that of the board of aldermen, the trial court impermissibly exceeded its scope of review. See *Burnham* v. *Planning & Zoning Commission,* supra, 189 Conn. 266 ("Examination of the decision of the trial court reveals that the court itself weighed the evidence in the record and determined the issues of fact involved therein. In so doing, the trial court exceeded the scope of judicial review. The court was in effect substituting its judgment for that of the [planning and zoning] commission, which is impermissible."). Although there is evidence in the record that some East Rock residents opposed the amendments, their opposition alone did not control the decision of the board of aldermen, which is statutorily obligated to take into account a variety of factors when making zoning decisions. See *Mallory* v. *West Hartford,* 138 Conn. 497, 506, 86 A.2d 668 (1952) (noting that although "[i]t is true that residents of the district oppose the change . . . [s]uch protests should be considered but are not controlling . . . [because] [t]he [zoning] commission must look at the problem as it affects the town as a whole" [citation omitted]).

Finally, we address briefly the plaintiffs' contention that the trial court properly concluded that the map amendment constituted impermissible spot zoning. "[S]pot zoning is the reclassification of a small area of

land in such a manner as to disturb the tenor of the surrounding neighborhood." (Internal quotation marks omitted.) *Blaker* v. *Planning & Zoning Commission*, 212 Conn. 471, 483, 562 A.2d 1093 (1989). Two elements must be satisfied to constitute spot zoning. "First, the zone change must concern a small area of land. Second, the change must be out of harmony with the comprehensive plan for zoning adopted to serve the needs of the community as a whole." Id. We have explained that, "[t]he vice of spot zoning lies in the fact that it singles out for special treatment a lot or a small area in a way that does not further such a plan." (Internal quotation marks omitted.) *Levinsky* v. *Zoning Commission*, 144 Conn. 117, 124, 127 A.2d 822 (1956).

Initially, we note that, in the case of a map change, the city zoning ordinance directs that, "[a]s a general policy, the [plan commission] shall not consider favorably any petition which would result in a total contiguous area . . . of less than two acres in the case of a residence district . . . ." New Haven Zoning Ordinance § 64 (d) (2) (c). The zone change at 691 Whitney Avenue joined an approximately 2.5 acre parcel to a much larger existing zone that already measured approximately 45 acres. Thus, in terms of lot size, "[t]his is not a case of spot zoning. It is not an attempt to wrench a single small lot from its environment and give it a new rating that disturbs the tenor of the neighborhood. . . . It is merely an extension of a zone already established. Such an extension, if it is in accord with the comprehensive plan and the general welfare, is proper." (Citation omitted.) *Hills* v. *Zoning Commission*, 139 Conn. 603, 609, 96 A.2d 212 (1953). Although we recognize that not "every extension of an existing district is, ipso facto, a compliance with a comprehensive plan and consequently not spot zoning . . . [t]he ultimate test is whether, upon the facts and circumstances before the zoning authority, the extension is, primarily, an orderly

development of an existing district which serves a public need in a reasonable way or whether it is an attempt to accommodate an individual property owner." *Wade v. Town Plan & Zoning Commission*, 145 Conn. 592, 596, 145 A.2d 597 (1958). In the present case, however, for the reasons previously discussed at length, the zone change unquestionably was part of a larger project that included the construction of a public school, clearly intended to serve the public interest and consistent with the comprehensive plan. This is not a case of spot zoning. See *Loh v. Town Plan & Zoning Commission*, 161 Conn. 32, 38, 282 A.2d 894 (1971) (concluding that, "[s]ince the change of zone, as we have previously indicated, is in harmony with the comprehensive plan, it cannot be classified as spot zoning").

The law governing review of legislative decisions by local zoning authorities is well settled in this state. In the present case, after an exhaustive review process, the board of aldermen specifically concluded that the text and map amendments were in accordance with the city's comprehensive plan and would benefit and promote the public interest. As this court has stated on numerous occasions, "courts must be cautious about disturbing the decisions of a local legislative zoning body familiar with the circumstances of community concern . . . ." *Spada v. Planning & Zoning Commission*, 159 Conn. 192, 199, 268 A.2d 376 (1970). "[When] a zoning authority has stated its reasons for a zone change . . . the reviewing court ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations." *First Hartford Realty Corp. v. Planning & Zoning Commission*, supra, 165 Conn. 543. We heed those warnings today, and conclude that the board of aldermen's approval of the zoning amendments in the present case adequately

was supported by the record, was in accordance with the city's comprehensive plan, and reasonably was related to the board of aldermen's police power as the city's zoning authority. We therefore reverse the judgment of the trial court and reinstate the board of aldermen's decision approving the zoning amendments.

## II

Having concluded that the board of aldermen's decision approving the text and map amendments to the city zoning regulations was valid, we now consider the plan commission's subsequent decision approving the board of education's site plan application for the construction of a new school facility at 691 Whitney Avenue. The trial court vacated the plan commission's decision after determining that the site plan was inconsistent with the "intent" of certain zoning regulations and that the plan commission had ignored testimony regarding the "impact" of the site plan. After examining the record, we conclude that the plan commission acted properly and within the scope of its authority.

Initially, we note that, in rendering decisions on site plan applications, the plan commission acts in an administrative capacity. *Norwich* v. *Norwalk Wilbert Vault Co.*, 208 Conn. 1, 12, 544 A.2d 152 (1988). Moreover, "in reviewing site plans the commission has no independent discretion beyond determining whether the plan complies with the applicable regulations . . . [and] is under a mandate to apply the requirements of the regulations as written." (Internal quotation marks omitted.) Id., 13. This austere standard of review is mandated by our legislature. General Statutes § 8-3 (g) provides in relevant part: "The zoning regulations may require that a site plan be filed with the commission or other municipal agency or official to aid in determining the conformity of a proposed building, use or structure with specific provisions of such regulations. . . .

A site plan may be modified or denied *only* if it fails to comply with the requirements already set forth in the zoning or inland wetlands regulations. . . ." (Emphasis added.) In the present case, the city zoning ordinance directs that the plan commission conduct its site plan review in accordance with § 8-3 (g); see New Haven Zoning Ordinance § 64 (f); and the interim site plan review guidelines in effect at the time of the plan commission's decision specified that "[d]enial or modification of any site plan by the appropriate authority must be based upon [z]oning [o]rdinance standards."

A reviewing court must defer to the judgment of the local zoning authority when considering an appeal of a site plan application decision. This court has explained that, "the court may not substitute its judgment for that of the commission . . . . [I]f it concludes that any one of several reasons submitted by the commission for its action is reasonably supported by the record, then the commission's actions must stand." *Friedman* v. *Planning & Zoning Commission*, 222 Conn. 262, 268, 608 A.2d 1178 (1992).

As we have discussed previously, after conducting a public meeting and hearing testimony from the project architect regarding compliance with the zoning regulations, the plan commission, in its report adopting and approving the site plan application recommendation at issue, expressly found that the proposed plan met all of the requirements of the RH-1 zone in which the site was located. In addition, with the exception of a few comments that were the basis for modifications[22]

---

[22] As we have discussed previously, these modifications were related to general concerns of public health, safety and welfare, and were not based on specific conflicts with the provisions of the RH-1 zoning regulations. Thus, the plan commission could not have used these issues as a basis for denial of the site plan. See *TLC Development, Inc.* v. *Planning & Zoning Commission*, 215 Conn. 527, 532, 577 A.2d 288 (1990) (concluding that, even when specified as "general objectives" under local zoning ordinance, issues concerning traffic and pedestrian access, though related to public safety, could not serve as proper basis for denial of site plan application). Thus,

addressed in the report, the plan commission found that the plan met the requirements of the applicable "[c]ity ordinances, [r]egulations, and standard details . . . ." Furthermore, the proposed school was a permitted use[23] under § 15 (b) (2) of the amended zoning

because the issues addressed in the comments section of the plan commission's report were not related to specific provisions in § 15 of the New Haven zoning ordinance, they could not have been used as reasons for denying the application. See also *Kosinski* v. *Lawlor*, 177 Conn. 420, 422, 427, 418 A.2d 66 (1979) (issuing writ of mandamus compelling site plan approval when zoning commission expressly had found that site plan met all applicable zoning regulations but nonetheless had voted to deny approval on ground that plan was "poor use of the site"; concluding that, "in examining the plaintiff's site plan to determine if it complied with the applicable zoning regulations, [the zoning commission] exercised and exhausted the discretion conferred upon [it] by the statutes and the regulations . . . [and] [o]nce the [zoning commission] had determined that the site plan complied with the applicable regulations, the issuance of a certificate of approval became a mere ministerial act").

Likewise, the trial court improperly focused on "traffic issues" as a basis for its reversal of the plan commission's decision. The trial court's reliance on this court's decision in *Friedman* v. *Planning & Zoning Commission*, supra, 222 Conn. 262, does not support its judgment. In *Friedman*, this court cited *Beit Havurah* v. *Zoning Board of Appeals*, 177 Conn. 440, 443, 418 A.2d 82 (1979), for the principle that "property whose use constitutes a permitted use is not immune from regulation under the laws of nuisance or other applicable statutes such as those relating to public safety . . . ." (Internal quotation marks omitted.) *Friedman* v. *Planning & Zoning Commission*, supra, 266. The *Friedman* court noted, however, that in *Beit Havurah*, "no violation of any such laws [had] been alleged." Id. Likewise, there is no such allegation in the present case. Moreover, the facts of *Friedman* differed significantly from those in the present case because the applicable local regulations in *Friedman* specifically required the submission of a traffic study, which the applicants had failed to provide, as a criterion for approval of the site plan application. Id. Essentially, *Friedman* simply reiterated the mandate of § 8-3 (g), that the local zoning regulations exclusively control the scope and depth of the site plan application review. In the present case, the plan commission was aware of this fact and properly conducted its review accordingly.

[23] The trial court, in rejecting the assertion that the school was a permitted use, cited § 11 of the New Haven zoning ordinance, which allows institutional development by successors of existing institutional uses only by special exception. Initially, we note, as we have discussed previously, that uses permitted by special exception are considered permitted uses, rather than nonconforming uses, under §§ 63 (d) and 67 (d) (10) of the New Haven

ordinance.[24] See *Beit Havurah* v. *Zoning Board of Appeals,* 177 Conn. 440, 443, 418 A.2d 82 (1979) (concluding that "designation of a particular use of property as a permitted use establishes a conclusive presumption that such use does not adversely affect the district and precludes further inquiry into its effect on traffic, municipal services, property values, or the general harmony of the district"). Thus, after making the threshold determination that the site plan met the applicable zoning requirements, the plan commission was required, according to § 8-3 (g), to approve the application. Upon examination of the record, we find no proper reason for the trial court to have overturned that decision.

The judgments are reversed and the cases are remanded to the trial court with direction to dismiss the plaintiffs' appeals.

In this opinion the other justices concurred.

---

zoning ordinance. Moreover, the provisions of § 11 were irrelevant to the deliberations of the plan commission, because the subject site of the application was located in the RH-1 district, which permitted successive institutional reuse as of right at the time the application was submitted.

[21] We decline to review the plaintiffs' claim, raised for the first time in this appeal, that the text amendment to the zoning ordinance did not in fact accomplish its express legislative intent, which was to make an educational institution an as of right permitted use in the RH-1 district. As we have observed repeatedly, "[t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Seymour* v. *Region One Board of Education,* 274 Conn. 92, 105, 874 A.2d 742, cert. denied, 546 U.S. 1016, 126 S. Ct. 659, 163 L. Ed. 2d 526 (2005); see *State* v. *Colon,* 272 Conn. 106, 215, 864 A.2d 666 (2004) ("[o]nly in the most exceptional circumstances . . . will this court consider a claim that was not raised [in the trial court]" [internal quotation marks omitted]), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). "Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him." *Larobina* v. *McDonald,* 274 Conn. 394, 402, 876 A.2d 522 (2005). The significance of these policies is highlighted in the present case, in which both the plaintiffs and the trial court explicitly relied on the assumption that the text amendment changed the zoning regulations to permit the construction of the proposed school as of right in the RH-1 district.